Filed 6/3/13; pub. order 6/20/13 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

|  |  |
|---|---|
| JANELLE BURRILL, | |
| Plaintiff and Respondent, | C068998 |
| v. | (Super. Ct. No. SCV28179) |
| JAYRAJ NAIR, | |
| Defendant and Appellant. | |

This defamation action arises out of a contentious custody dispute that has made its way to this court five times.[1]  In the underlying case, Jayraj Nair persistently fought court-ordered efforts to reunify his former wife, Bindu, with their older son, Suraj.  (We

---

[1] See *Nair v. Superior Court* (May 28, 2009, C061761) [summary denial of petition for writ of mandate] (*Nair I*); *In re Marriage of Nair* (Dec. 29, 2009, C059661) [nonpub. opn.] (*Nair II*); *In re Marriage of Nair* (June 10, 2010, C061097 & C062004) [nonpub. opn.] (*Nair III*); *Nair v. Superior Court* (Mar. 11, 2010, C064338) [summary denial of petition for writ of mandate] (*Nair IV*); and *In re Marriage of Nair* (Mar. 25, 2011, C064566) [nonpub. opn.] (*Nair V*).  We take judicial notice of *Nair II, III,* and *V*.  (Evid. Code, §§ 451, 452, subds. (a) & (d), 459.)

1

refer to defendant by his last name and to other members of the Nair family by their first names for clarity.) After the couple separated, Suraj sided with his father and moved in with him. Their younger son, Sujay, continued to live with his mother. Following dissolution of the marriage, the family court awarded Nair and Bindu joint legal custody of both sons and found the best interest of the children required joint physical custody, but that Suraj's estrangement from his mother required therapy before that could happen. (*Nair II*, *supra*, C059661.)

Janelle Burrill, Ph.D., was appointed to serve as reunification counselor to assist in the reunification process. After Dr. Burrill filed a reunification report concluding Nair was emotionally and psychologically abusing Suraj by, among other things, indoctrinating the child to believe his mother was "evil and never loved him," and she "kidnapped Sujay and [was] holding him hostage," and further opining Nair presented a credible threat to the physical safety of Bindu and both of their sons, Suraj was removed from Nair's house and ultimately placed with his mother. Thereafter, the family court issued a domestic violence restraining order preventing Nair from contacting Bindu and their two sons, except for short supervised visits. We affirmed this order on appeal. (*Nair III*, *supra*, C061097 & C062004.)

In the defamation lawsuit, Dr. Burrill alleges Nair made a number of defamatory statements online and over the radio following the issuance of the reunification report and removal of Suraj from his physical custody.[2] One of these statements, posted on CNN's iReport Website, accused Dr. Burrill of "criminal fraud and modern day slavery using Parental Alienation SCAM, enslavement of children for $$$$$$ in California." The

---

[2] The lawsuit also alleged that Nair violated Penal Code section 632 by surreptitiously recording one of Suraj's therapy sessions. This cause of action is not implicated by the issues raised on appeal and will not be further discussed.

posting continued: "Corrupt Criminals like [Dr. Burrill] and their good-ol-network are today's 'modern slave traders' trading 'children' with vindictive retribution and for money." The posting also accused Dr. Burrill of "child abuse" and "financial extortion." In another statement, made during an interview with Sacramento area radio station "KFBKnewstalk" (http://www.kfbk.com/main.html, retrieved May 20, 2013), Nair claimed Dr. Burrill "extorted money" from him. Nair further asserted: "[Dr. Burrill] does not have any license to practice psychology in California. She's got a diploma from some online mill. And on top of it, she makes DSM-[IV] diagnoses; she prescribed Benzodiazepine for my son. A person who is not even a psychologist or psychiatrist prescribing medication in California? That's illegal."

Nair moved to strike the defamation cause of action pursuant to Code of Civil Procedure section 425.16, the anti-SLAPP statute.[3] The trial court denied the motion. Nair appeals. The issues on appeal have been simplified by the fact that Dr. Burrill concedes the defamation cause of action arises from protected activity within the meaning of the anti-SLAPP statute. Dr. Burrill also concedes that, as a "limited purpose public figure," in order to prevail on the merits, she "must demonstrate not only the falsity of the statements at issue, but also that they were published with 'actual malice.'" After independently reviewing the trial court's ruling, we conclude Dr. Burrill has demonstrated a probability of prevailing on the merits of her defamation cause of action and affirm the order denying the special motion to strike.

---

[3] Undesignated statutory references are to the Code of Civil Procedure. SLAPP is an acronym for "strategic lawsuit against public participation."

BACKGROUND

***Underlying Custody Dispute***

In order to place the defamation lawsuit and anti-SLAPP motion in context, we begin with an overview of the underlying custody dispute between Nair and Bindu. In doing so, we draw in part on our unpublished opinions in *Nair II, supra,* C059661, *Nair III, supra,* C061097 and C062004, and *Nair V, supra,* C064566, of which we have taken judicial notice.

Nair and Bindu married in July 1995. They separated ten years later. In the meantime, Suraj and Sujay were born to the union. At the time of separation, Suraj was nine years old and Sujay was about a year and a half. In February 2006, Bindu filed for a domestic violence restraining order against Nair. Three weeks later, Nair filed a petition for dissolution of the marriage. The matters were consolidated and the parties filed numerous motions regarding child custody and visitation. (*Nair II*, *supra*, C059661.)

In July 2006, the family court ordered Nair to pay child support for Suraj and Sujay. The following month, Suraj, then ten years old, sided with his father and moved in with him. Two-year-old Sujay remained with his mother. (*Nair III*, *supra*, C061097 & C062004.)

According to Sharon Sloper, MFT, who prepared a report for the family court in September 2006, Suraj had a positive relationship with his mother prior to the separation. However, this relationship began to deteriorate. Sloper believed that "'Suraj's behavior symptoms (not speaking to [Bindu] or calling her names, refusing to cooperate with her or her side of the family, saying that he hates her and that "there is nothing I like about her") and his strong allegiance to [Nair] ("there are so many things I love about him . . . there is nothing I don't like") certainly indicate that Suraj may feel the need to please his father or at least not express any care for his mother.'"

4

In November 2006, the family court entered a judgment of dissolution as to marital status only. In March 2007, counsel was appointed to represent Suraj and Sujay. The family court allowed Suraj to remain with Nair. Sujay was allowed to remain with Bindu. (*Nair II*, *supra*, C059661.) The same month, Gene Roeder, Ph.D., prepared an evaluation report, in which he noted that Suraj stated: "'I just want to live with my dad and my brother and be away from her [referring to his mother] and forget I ever knew her.'" The report noted Suraj refused to be in the same room as Bindu and referred to his mother only as "'her.'" The report further noted Suraj repeated the same phrases as Nair and refused to participate in any psychological testing because he believed Dr. Roeder would use the results against him. The report concluded that "'Suraj presents with the same level of hostility and expressing the same distortions [of reality] as his father. While there was once a positive relationship between mother and son, and at the time of the previous evaluation there was still evidence of some positive attachments, there is now only utter disdain and contempt.'"

In September 2007, Nair sought a restraining order against Bindu's father, alleging sexual molestation and harassment of Suraj and Sujay. (*Nair II*, *supra*, C059661.) The same month, James Brentt, Ph.D., prepared an evaluation report that also noted Suraj's alignment with Nair and alienation from Bindu.

In February 2008, trial was held on issues of custody and visitation. The family court also heard Nair's request for a restraining order against Bindu's father. (*Nair II*, *supra*, C059661.) The following month, the family court issued a written ruling that awarded Nair and Bindu joint legal custody and found the long-term best interests of Suraj and Sujay would require joint physical custody, but Suraj's estrangement from Bindu required therapy before that could happen. A two-tier visitation schedule was also provided. (*Nair II*, *supra*, C059661.) A separate order issued that denied Nair's request for a restraining order against Bindu's father due to an absence of evidence.

In May 2008, Nair filed an order to show cause seeking 50 percent physical custody of Sujay and further seeking child support from Bindu for Suraj. The same month, Bindu filed a number of orders to show cause seeking (1) supervised visits between Nair and Sujay, (2) no contact between Suraj and Sujay until a therapist was appointed for Sujay, (3) removal of Suraj from Nair's physical custody, and (4) an order preventing Nair from contacting her. The family court ordered the requested supervised visits between Nair and Sujay and also ordered no contact between Suraj and Sujay until a therapist was appointed for Sujay. (*Nair II*, *supra*, C059661; *Nair III*, *supra*, C061097 & C062004.)

In June 2008, the family court substituted therapists for the children and confirmed the orders issued the previous month. The following month, the family court confirmed the previous visitation orders, again substituted therapists, and ordered Nair not to contact Bindu. (*Nair II*, *supra*, C059661.)

In August 2008, the family court awarded Bindu $75,000 in attorney fees pursuant to Family Code section 271, subdivision (a), "based upon [Nair's] conduct which frustrated the policy of the law to promote settlement of litigation and reduce the costs of litigation." The court explained the ruling was "based in large part on [Nair's] repeated attempts to frustrate both the spirit and the letter of the Court's rulings with which he disagrees. For example, . . . the attempts of the Court to start the reunification process between [Suraj] and [Bindu] has been frustrated by [Nair's] disputes with the proposed counselors either by refusing to pay for the counseling or lodging complaints about the counselors' behavior with professional review boards." (*Nair II*, *supra*, C059661.) Indeed, during a previous hearing, Nair accused one of Suraj's appointed therapists, David Chervick, MFT, of accepting "$2,000 as a bribe" to render an unfavorable opinion. The family court discounted this accusation as "outrageous."

We affirmed the June and July 2008 custody, visitation, and no-contact orders, as well as the August 2008 attorney fee award in *Nair II, supra,* C059661.

Following the attorney fee award, Nair moved to disqualify Commissioner Dirk Amara from presiding over the case, asserting that Commissioner Amara made "prejudicial and biased rulings" because of "overt prejudice, covert racism/discrimination and [his] vindictive retribution towards [Nair]." The motion was denied based on Nair's failure to offer specific facts in support of the allegations.

In December 2008, the family court denied Nair's request for child support and continued his obligation to pay child support to Bindu, "finding that 'to the extent [Bindu] is not exercising her 50% parenting time with [Suraj], this is due solely to [Nair's] misconduct in alienating [Suraj] from his mother and failing to take all necessary steps to reunify [Suraj] with his mother consistent with the [*sic*] all parenting orders in effect.'" (*Nair III*, *supra*, C061097 & C062004.)

We affirmed this ruling in *Nair III, supra,* C061097 and C062004).

### *Appointment of Dr. Burrill*

In October 2008, the family court appointed Dr. Burrill to act as Suraj's therapist "to facilitate the reunification process" between Suraj and his mother. Two weeks later, Nair signed a fee agreement charging $150 per hour for Dr. Burrill's services as Suraj's therapist. On the face of the agreement, in reference to a paragraph requiring payment for "telephone consultations" with "collateral contacts" and another paragraph providing for costs and attorney fees in the event litigation was required to enforce the agreement, Nair wrote, "will require prior authorization." This notation was not made in reference to the paragraph requiring payment for "reports" and "other professional services." However, below his signature, Nair wrote: "Conditional:  Pls [*sic*] get pre-auth for every charge." The same day Nair signed the fee agreement, Dr. Burrill met with Suraj for an

intake appointment.  Two weeks later, she had another counseling appointment with Suraj and also met with Nair.

On December 2, 2008, Dr. Burrill met with Suraj a third time.  The next day, she sent Nair a letter stating she had been appointed "to act as reunification therapist, for Suraj and Bindu, not as Suraj's individual therapist," and her "fee for reunification therapy is $165.00 per hour, with a $1,500.00 retainer used for report preparation and contact with collateral sources."  The letter attached a new fee agreement reflecting these terms.  The letter also attached invoices for services rendered, reflecting an unpaid balance of $2,352.50 (mostly for report preparation and document review) that would be reduced by $752.50 as a "professional courtesy," for a total unpaid balance of $1,600.  The invoices also reflected that Suraj paid for two of his appointments with his own money.

On December 15, 2008, Dr. Burrill sent Nair a letter again requesting that he sign the new fee agreement and demanding payment of $4,642.50, reflecting an outstanding balance of $2,977.50, plus $1,500 for the retainer, plus $165 for the next scheduled appointment.

On December 29, 2008, Suraj sent Dr. Burrill an e-mail stating he had no need for her "so-called expertise" and would not be meeting with her "ever again."  The same day, Nair sent Dr. Burrill an e-mail confirming he had paid only $300 of her outstanding bill, along with another $300 Suraj paid "from his personal chess prize monies."  Nair refused to pay for any of Dr. Burrill's other services, explaining that these services were not "pre-authorized by father."  Nair also objected to the new fee agreement and stated:  "Please review the terms of the financial agreement (signed 10/15/2008) so there is no confusion and additional fodder for unscrupulous lawyers.  I hope that you will maintain your professional ethics and integrity and not give us a repeat of David Cherwick [*sic*] like

8

response of accepting bribes from the abusing party and making erroneous recommendations to destroy my boys."

On December 31, 2008, Nair sent Dr. Burrill another e-mail stating he spoke with Suraj regarding future counseling sessions and Suraj "made it very clear" that "any reunification and counselling [*sic*] is history." He continued: "[Suraj] believes that [Sujay] is held hostage and he does not negotiate with hostage takers." Nair closed the letter with: "Please communicate in writing so there is no confusion, misrepresentation or crumbs for unscrupulous lawyers." The same day, Sujay had an appointment with his therapist, Jacqueline Parker, MFT, during which he stated that both Nair and Suraj had said "bad words" about Bindu and also that they wanted to kill her. According to Parker, "Sujay was very serious when he made this statement."

On January 5, 2009, Nair sent Dr. Burrill another e-mail stating: "[U]nless Suraj is willing to participate in sessions, I will not be physically forcing Suraj to meet with you. If anything changes, I will call you and support this process 75000%. [¶] Please do not use this email for charging more $$$ or as fodder for your good friend, the prejudicial Amara, his good old network or any of the unscrupulous lawyers on leashes."

On January 8, 2009, Dr. Burrill sent an e-mail to Nair's attorney informing her that she "intend[ed] to continue the reunification process ordered by the Court" and expected Suraj to be at her office for his next appointment the following week. The same day, Nair sent an e-mail to Dr. Burrill again refusing to "force" Suraj to meet with her. He continued: "Pls [*sic*] feel free to advise unscrupulous lawyers and their masters with great details, give fodder to the prejudicial Amara however, a common sense better than expert feedback is that therapy will only be relevant or useful with a willing participant. Take it for what it is worth but a better approach would be to initiate 50/50 custody plan tomorrow and enable sibling contact and win Suraj over over-time [*sic*]. If you continue to pursue your money making schemes, covert racism and ongoing misconduct I will

9

follow up with the appropriate oversight agencies and the media knowing very well that the prejudicial Amara is a good friend of yours." He concluded the e-mail: "Feel free to put this email in evidence as you plan to do and I assure you that I will stand up for my children, protect them and stand up against greed, racism and prejudice of the good old ***** network. Its [*sic*] unfortunate that my children, family, community now feel that Amara and his friends like you represent the Klan operating without hoods in black robes instead of white. I came to this country without any parasites 15 years ago thinking slavery was abolished here."

### *California Board of Behavioral Sciences (BBS) Complaint*

On January 30, 2009, Nair filed a complaint against Dr. Burrill with the BBS, alleging Dr. Burrill violated the rules of professional conduct by (1) intentionally or recklessly causing physical or emotional harm to Suraj, and (2) failing to disclose the fee to be charged for her services prior to commencement of treatment. In the complaint, Nair claimed Dr. Burrill threatened "to issue a prejudicial & biased 'great report' to the court unless [he] compl[ied] with her demand to pay her $4642.50." The complaint further alleged: "[Dr. Burrill] asserted that Commissioner Amara who appointed her as the therapist for Suraj is a good friend and often calls her up. [Dr. Burrill] elaborated on her connections with the court and its network, threatened me of consequences if I do not submit to her demands. I have detailed notes from the session and the context was very hostile and threatening, specific quotes from [Dr. Burrill] during the session follow - [¶] a. 'You will loose [*sic*] all custody, I can make things happen for you' - implying pay me and my network will work for you. [¶] b. 'Why, How did you come to this country?' - implying go back to your country, you don't belong here. [¶] c. 'I know Amara very well and we are good friends - He often calls me' - implying that if you don't do what I ask you to do, Amara will continue to harm you and your kids [*sic*] [¶] d. 'You better

10

follow the system and my rules' - implying we will harm you and your kind. [¶] e. 'I know everyone in this system' - implying that you cannot protect yourself."

The complaint then purported to quote Dr. Burrill's statements made to Suraj during his first appointment: "a. 'You will never see your brother' - threat to minor wrt [*sic*] breaking sibling relationship and contact. [¶] b. 'Your father fights everybody, he fights the court, the therapist, anything he comes across' - implying his father is a bad person, a fighter [*sic*] [¶] c. 'Your father thinks he knows everything, more than me, more than the court' - implying that your father is misguided and wrong [¶] d. 'Why, does your father think so highly of himself that he will not do supervised visitation with [Sujay]' - implying father is an ego-maniac [*sic*] [¶] e. 'Your father does not love his son, he does not love you either' - asserts father does not love his own son Sujay. [¶] f. 'You think you know it all - this system is crap?' - implies that you think like your father [*sic*]"

### The Reunification Report

On February 6, 2009, Dr. Burrill submitted a 30-page reunification report. Among other things, Dr. Burrill recommended Bindu be given sole legal and physical custody of Suraj, with an order preventing Nair from contacting Bindu and the children. She noted: "I would not make such a recommendation unless I was certain this was Suraj's only chance at normalcy. The emotional and psychological and potential for physical abuse by Father against Suraj places Suraj at serious risk for permanent harm. Alienation by Father against Mother was noted back in September 2006, by [Sharon Sloper], MFT, only one month after Mother and [Suraj's] last contact. Several mental health professionals have noted the same observations as [Sloper], including Dr. James Brentt and Dr. Gene Roeder, yet nothing has been implemented to assist Suraj nor change this situation, rather it has worsened. Father will never comply with court orders. The emotional and psychological abuse by Father [of Suraj] has only worsened."

11

For purposes of this opinion, we need not set forth in detail each example of emotional and psychological abuse Dr. Burrill noted in her report. The following examples will suffice:

(1) "Father has told Suraj that Mother kidnapped Sujay and is holding him hostage (just like she did when she held Suraj for 41 days.) Father believes it is minor Suraj who is responsible for setting Sujay free from Mother. As a reminder of this responsibility, Father sets the table with a full place setting for Sujay, which they all look at throughout the meal. This is very serious emotional abuse."

(2) "[Suraj] repeated many of the negative statements made by Father in his appointment. Suraj blames Mother for many things, including that she 'kidnapped' him and took his younger brother, Sujay, who she now holds 'hostage.' Additionally, Suraj is extremely negative about the Court, and legal and mental health professionals. He referred to therapist David Chervick, MFT as 'a scumbag.' Suraj stated, 'So far, he's [David Chervick] got $1,000 . . . .' Suraj stated, 'There's no one good in this system.' He is only willing to continue with this Therapist if I am able to get him more time to spend with his brother at Father's home. Suraj reported he has had no contact with Sujay since May 10, 2008. Suraj stated that his father will not have supervised visits 'ever' with [Sujay]; why should he? Suraj believes that if I want to help, then it is up to me to obtain what his father wants; otherwise he'll never be back."

(3) "Father stated to me in front of Suraj that she [Mother] wanted Suraj placed with a third party. Suraj then repeated this to me when alone with me."

(4) "[Father] has told Suraj his mother is evil and never loved him. Worst of all, there is a potential that Father or Suraj could harm Mother, themselves, or Sujay. Minor Sujay reported to his therapist, Jacqueline Parker on December 31, 2008, 'My dad and my brother say bad words about my mom' [pause] 'and say to kill my mom' [pause] 'just that's a joke that they want to kill my mom.'" Parker reported Sujay was "very serious."

12

(5) "When Suraj was through with each session, he then insisted that he be the one to **pay me ($150) for the hour because**, 'I am the one who caused this and I want to pay for what I have done.'"

Dr. Burrill also offered an opinion on Nair's psychological behaviors: "grandiosity ([Suraj] attends Stanford; [Father] went to MIT, [I am head of Intel], taunts the court, mother, child), exhibits rapid flight of ideas, rapid speech, which loses meaning as he cannot remain focused or on topic; he cannot respond rationally and calmly to questions, and yet is intelligent, but his reality and judgment is distorted; he is easily irritated and frustrated, which is frightening to his children and others. He has no empathy for his children, has sociopathic behaviors (disregard for courts, children, others' rights and well-being), unpredictability, and rage." Dr. Burrill further noted Bindu "confided previously that [Nair] was emotionally and physically violent," and concluded: "I have witnessed behaviors of the person Mother and [Suraj] lived with and they are not normal and anyone could be at risk who gets in his way. Father presents a serious risk of physical harm to Mother and to minor Suraj and probably Sujay, if he has contact. After all [*sic*] Father has told both Minors, **mom is to be killed**."

### The Domestic Violence Restraining Order

On February 10, 2009, an ex parte hearing was held on Bindu's request for emergency orders to prevent contact with her and Suraj by Nair. The next day, the family court issued a temporary restraining order and scheduled a hearing on a domestic violence restraining order for the following month. While Nair was being served with the temporary restraining order during a court hearing, Suraj was removed from his father's home in handcuffs and placed in the Sutter Center for Psychiatry in Sacramento. Suraj remained at the psychiatric facility until March 3, 2009, when he was released to his mother. (*Nair III*, *supra*, C061097 & C062004.)

13

On March 10, 2009, Nair and Bindu attended a hearing on the domestic violence restraining order. Bindu testified that Nair was physically abusive toward her in 1996 and 1997 and he had kicked Suraj during this time period. Bindu also reported that Sujay told his therapist Nair threatened to kill or hurt her. During cross-examination by Nair (acting in pro per), Bindu testified: "You have emotionally abused Suraj even when we were together in the marriage to take sides. Bad-mouthed mom, mom's family. Made him tell lies about -- during the evaluation about physical and sexual abuse [by the maternal grandfather]. You have not taken him to counseling as was recommended by every counselor, five or six that have been in this case." (*Nair III*, *supra*, C061097 & C062004.) Dr. Burrill also testified during the hearing. She testified that she believed Nair remained a threat to Bindu's safety, lacked impulse control, suffered unstable moods, lacked empathy, and exhibited sociopathic behaviors. The reunification report was also introduced into evidence. (*Nair III*, *supra*, C061097 & C062004.)

On March 25, 2009, the requested domestic violence restraining order was issued prohibiting Nair from having any contact with Bindu or Suraj for one year. Nair was allowed supervised visitation with Sujay. An attachment to the restraining order notes: "The evidence on which the court relies is contained in the reports of Dr. Burrill and the comments of other court-appointed therapists in this case, as well as the following evidence: testimony of Kelly Graham regarding [Suraj's] extreme reaction to [his mother's] presences on [his] school campus; evidence of [Nair] not fully complying with court orders reflecting lack of commitment to engage in the counseling and reunification program laid out by the court; evidence of [Nair's] desire to control things by taking [Suraj] to an unauthorized therapist, by using [Nair's] own doctor for a psychiatric evaluation instead of relying on neutral court evaluators, by extremely inappropriate conduct in having [Suraj] pay for his own counseling sessions, and by evidence that

14

[Nair] has not undertaken any supervised visitations with [Sujay]." (*Nair V, supra,* C064566.)

We affirmed the validity of the restraining order in *Nair III, supra,* C061097 and C062004.

### *Discovery Seeking to Discredit Dr. Burrill*

While Nair's appeal challenging the restraining order was pending, he sought to conduct discovery aimed primarily at discrediting Dr. Burrill. To this end, Nair filed motions to remove Dr. Burrill as Suraj's reunification therapist, require Dr. Burrill to answer certain questions at deposition and produce certain documents, impose sanctions on Dr. Burrill, and compel release of a recording Suraj surreptitiously made of his December 2, 2008, therapy session. Nair further sought orders requiring Suraj to submit to a psychological evaluation and appointing counsel for the minor. Bindu opposed the motions and filed a number of her own, including motions to stay all further discovery related to the domestic violence restraining order and to strike an improperly noticed deposition of Robert Blanco, M.D., Suraj's treating psychiatrist at the psychiatric facility. Following a hearing on October 27, 2009, the family court denied Nair's discovery motions and granted Bindu's motions. Among other things, the family court struck Dr. Blanco's deposition and sealed the recording of Suraj's therapy session with Dr. Burrill. (*Nair V, supra,* C064566.)

We affirmed the order denying Nair's discovery motions in *Nair V, supra,* C064566.

### *Online Postings*

In November 2009, the following posting was placed on the rightsformothers.com blog site (spelling and grammatical errors reproduced verbatim): "Janelle Burrill: In Handcuffs By Christmas? [¶] **We can only hope! We'll have to find some more corrupt bastards to go after (they are many to choose from). From 'Expose**

15

**Burrill':** [¶] STAND UP AGAINST THE FRAUD JANELLE BURRILL AND HER ATTORNEY JOHN O'DONNELL. THEY CANNOT BURY REAL EVIDENCE. THEY CANNOT SHUT OUT THE VICITMS. OUR VOICES ARE BEING HEARD. [¶] THE LIAR AND HER COHORTS ARE EXPOSED!! [¶] The DCA [Department of Consumer Affairs] Division of investigation is working hard for the last six months. [¶] They have met with the victimized children that Burrill abused, [¶] They have heard Burrill ― caught on tape abusing, lying, threatening a child, [¶] They have multiple court transcripts of Burrill lying under oath, pathological liar, [¶] They have heard from professionals that Burrill misrepresented and blatantly lied about in court testimony. They have uncovered evidence of fraudulent conspiracy. [¶] They have met with over a dozen victims and recorded their stories [¶] They have uncovered evidence of financial fraud and evidence of $$$ corruption. [¶] The District Attorney's office is now involved. All of Burrills cronies, friends in her PAS [Parental Alienation Syndrome] cottage industry cannot bury real evidence. DCA Division of Investigation will submit their findings to BBS and BBS will flush Janelle Burrill LCS License 16216 and file formal accusation (public content) for prosecution by Attorney Generals office. [¶] Once BBS actions go public in the next couple of months, next steps of civil and criminal investigations and prosecution will start! This is the beginning of the end to the corrupt LCS practice by Janelle Burrill. All her past reports and recommendations to the courts in her fraudulent career will be thrown out. Take the AG's report back to the courts once it is public to nullify any bull shit she filed with the courts."

Around the same time, the following statements were posted on CNN's iReport website (spelling and grammatical errors reproduced verbatim):

(1) "**Allegation:** Janelle Burrill BBS LCS 16216 is the Sacramento (PAS) proponent, perpetuates criminal fraud and Modern Day Slavery using Parental Alienation SCAM, enslavement of children for $$$$$$ in California."

16

(2) "**Allegation:** Loving Children 'Enslaved' by corrupt fraud, millionaire Janelle Burrill working in Sacramento & Placer County Superior Courts."

(3) "Corrupt criminals like Janelle Burrill and their good-ol-network are today's 'modern slave traders' trading 'children' with vindictive retribution and for money.  This abhorrent trade of children, is a calumny and a disgrace!"

(4) "**California Attorney General, Sacramento & Placer District Attorney's - Its time to cooperate, investigate to bring criminals like Janelle Burrill to justice and free the enslaved children.  Please protect California families and children from corrupt social workers.**"

(5) "**Allegation:** Janelle Burrill conspired, fabricated DV [domestic violence] allegations, enslaved & abused child, deliberately and maliciously lied under oath to commit willfull perjury at Placer County Superior Court.  Perpetuated a crime against this family.  Pathological lying for money, Larceny, Extortion & racketeering."

*Criminal Complaint*

In August 2010, Nair filed a criminal complaint against Dr. Burrill with the Sacramento and Roseville Police Departments and the Sacramento Division of the Federal Bureau of Investigation.  The complaint alleged that Dr. Burrill:  (1) fraudulently misrepresented her credentials and qualifications; (2) "verbally and emotionally abused Suraj" by (a) "effecting fraudulent . . . removal of [Suraj] from the home and family he loved in handcuffs," (b) "recommending and forcibly holding him at Sutter Psychiatry," (c) "[t]reating him 'as a slave against his wishes . . . to penalize Suraj for his courage - standing up and questioning [Dr. Burrill's] fraudulent expertise and credentials," (d) "conspired and perpetrated malicious abuse" by recommending a stop to Suraj's activities of "[c]hess, [m]usic and advanced Stanford education," and (e) "conspired with her ex-supervisor psychiatrist Janak Mehtani to effectuate/prescribe unnecessary and harmful drugs on [Suraj]," specifically, Benzodiazepine; (3) filed false reports and

17

committed perjury; (4) engaged in "extortion and racketeering" by (a) misrepresenting the fees charged for her services, (b) altering the fee agreement after services began, (c) demanding $4,642 "for services that were never listed or provided," and (d) accepting bribes from Bindu; and (5) obstructed justice.

*KFBK Interview and Neighborhood Flyer*

The same day Nair filed the criminal complaint against Dr. Burrill, he was interviewed by KFBK radio "newstalk." He claimed Dr. Burrill "committed willful perjury" and "extorted money" from him. Nair continued: "She wanted $4,000.00 for services she never rendered to us. Credential-wise, she does not have any license to practice psychology in California. She's got a diploma from some online mill. And on top of it, she makes DSM-[IV] diagnoses; she prescribed Benzodiazepine for my son. A person who is not even a psychologist or psychiatrist prescribing medication in California? That's illegal." Around the same time, a flyer was posted on the front doors of houses in Dr. Burrill's neighborhood. The flyer advised: "Neighbors . . . you might want to know . . . [¶] That your neighbor @ 1107 Sand Bar Circle (Janelle Burrill) is under investigation by the police and other agencies on fraud, perjury and child abuse. [¶] She has been taking children away from their primary parents and putting them in abusive homes. [¶] Please keep your children safe and inform anyone you know that may go through the family court system to NOT allow Janelle Burrill to be the mediator. [¶] Google her name to see the victims and hear their stories."

*The Defamation Complaint*

In October 2010, Dr. Burrill filed a civil complaint against Nair, including a cause of action for defamation. The defamation cause of action alleged the statements set forth above (i.e., those made in the online postings, the radio interview, and the neighborhood flyer) "were defamatory, published by [Nair], were false, unprivileged and exposed [Dr. Burrill] to hatred, contempt, ridicule, disgrace and caused her to be shunned and

18

avoided by attorneys, potential clients, patients, the public and by the courts, and [have] injured her profoundly in her occupation."

### *The Anti-SLAPP Motion*

In December 2010, Nair filed an anti-SLAPP motion seeking to strike the defamation cause of action. Nair argued this cause of action arose from the exercise of his right to free speech within the meaning of the anti-SLAPP statute. He further argued Dr. Burrill would not be able to show a probability of prevailing on the merits because: (1) she could not produce any competent evidence he was the author of the statements made in the online postings or the neighborhood flyer; (2) the allegedly defamatory statements were either true or opinion; (3) these statements were also privileged under Civil Code section 47, subdivision (d); and (4) Dr. Burrill would not be able to establish actual malice by clear and convincing evidence.

Dr. Burrill opposed the motion. She did not dispute that the defamation cause of action arose from the exercise of Nair's right to free speech within the meaning of the anti-SLAPP statute. Nor did she dispute that, as a limited purpose public figure, she would be required to establish actual malice by clear and convincing evidence in order to prevail on the merits of the claim. As mentioned, these points are also conceded on appeal. Dr. Burrill did argue the anti-SLAPP motion should be denied because her complaint was both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment. Dr. Burrill argued that, in each of the publications, Nair made false statements of fact, which were defamatory and unprivileged, and he did so with actual malice.

With respect to Nair's authorship of the online postings, Dr. Burrill provided evidence in the form of: (1) an admission Nair made during a deposition; (2) a declaration submitted by Dr. Patrick Farrell, Chair of the Linguistics Department at the University of California, Davis, stating he compared distinctive features of Nair's

authenticated writings to those of the online postings and concluded the likelihood of anyone else being the author "is virtually nil"; (3) a declaration submitted by James Blanco, a forensic document examiner, also identifying Nair as the author of the online postings based on eight distinctive features of his writing; and (4) a declaration submitted by Dr. Raphael Diaz, a statistician, concluding that based on five distinctive features of Nair's writing, the chances of finding more than one person using these distinctive features is one in more than two billion.

The trial court denied the motion. With respect to Nair's authorship of the online postings, the trial court found Dr. Burrill's evidence "could 'sustain a favorable judgment if the evidence submitted by [her] is credited.'" The trial court also noted Nair did not dispute making the statements in the radio interview.[4] With respect to whether the statements were false factual assertions or non-actionable opinion, the trial court found Dr. Burrill "made a prima facie showing that she did not illegally prescribe drugs, abuse children, enslave children, commit extortion, etc." In reaching this conclusion, the trial court noted Dr. Burrill's declaration in opposition to the motion, in which she: (1) denied extorting money from Nair and explained the fee dispute described in detail above; (2) denied prescribing medication to Suraj or anyone else; (3) denied committing perjury; (4) denied committing child abuse against Suraj or any other minor; and (5) denied accepting money to influence her custody recommendations, which was asserted to be criminal fraud and child enslavement in the CNN iReport posting. The trial court also explained: "The allegations are more than just ranting by a concerned parent or an aggrieved litigant on an obscure blog. The court must look at the totality of the

---

[4] On appeal, Nair does not challenge the trial court's finding that Dr. Burrill made a sufficient prima facie showing of facts to sustain a favorable finding on the issue of Nair's authorship of the online postings. Had he done so, we would uphold the trial court's ruling in this regard.

circumstances to determine whether [Dr. Burrill] met her burden. In light of all the allegations, the court finds that [Nair's] alleged statements cannot be construed as mere opinion and hyperbole for purposes of the instant motion. This question must ultimately be decided by the trier of fact."

The trial court also found Dr. Burrill established a probability she could produce clear and convincing evidence of actual malice at trial, explaining: "[Dr. Burrill's] evidence shows that [Nair] appeared on the KFBK radio station and stated that [she] had illegally prescribed medication for [Suraj], but that [she] had not done so. The evidence further shows that [Nair] harbored substantial anger and hostility toward [Dr. Burrill], failed to investigate his allegations before publicizing them and knew that his statements were false. [Dr. Burrill] has also offered sufficient evidence . . . of knowing falsity as to the statements regarding extortion, enslavement, drugging [Suraj], prescribing drugs without a license, commission of child abuse and similar statements." Finally, the trial court disagreed with Nair's assertion that the statements made during his radio interview were protected by Civil Code section 47, subdivision (d).

DISCUSSION

I

### *The Anti-SLAPP Statute*

Section 425.16 provides in relevant part: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) "[I]n applying the statute a court generally is required to engage in a two-step process: 'First, the court decides whether the defendant has made a threshold showing that the challenged cause of action is one

21

arising from protected activity. . . .  If the court finds such a showing has been made, it then determines whether the plaintiff has demonstrated a probability of prevailing on the claim.'"  (*Taus v. Loftus* (2007) 40 Cal.4th 683, 712 (*Taus*), quoting *Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67.)

Here, as mentioned, Dr. Burrill concedes the defamation cause of action arises from protected activity within the meaning of the anti-SLAPP statute.  Accordingly, we shall address only the second step of the anti-SLAPP analysis.  We decide this step of the analysis "on consideration of 'the pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.'  (§ 425.16, subd. (b).)  Looking at those affidavits, '[w]e do not weigh credibility, nor do we evaluate the weight of the evidence.  Instead, we accept as true all evidence favorable to the plaintiff and assess the defendant's evidence only to determine if it defeats the plaintiff's submission as a matter of law.'  [Citation.]"  (*Grewal v. Jammu* (2011) 191 Cal.App.4th 977, 989.)  This is because the anti-SLAPP statute does not require the plaintiff "'to *prove* the specified claim to the trial court'; rather, so as to not deprive the plaintiff of a jury trial, the appropriate inquiry is whether the plaintiff has stated and substantiated a legally sufficient claim."  (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 105 (*Mann*).)  "'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited."'  [Citation.]"  (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 820 (*Oasis*).)

"If the plaintiff 'can show a probability of prevailing on *any part of* [*his or her*] *claim*, the cause of action is not meritless' and will not be stricken; 'once a plaintiff shows a probability of prevailing on any part of [his or her] claim, the plaintiff *has established* that [his or her] cause of action has some merit and the entire cause of action

22

stands.'" (*Oasis*, *supra*, 51 Cal.4th at p. 820, quoting *Mann*, *supra*, 120 Cal.App.4th at p. 106.)

Nair disputes this principle of anti-SLAPP review. He argues that we may strike meritless portions of the defamation cause of action even if we conclude Dr. Burrill has established a probability of prevailing as to other portions of the cause of action. In support of this argument, he relies on *Wallace v. McCubbin* (2011) 196 Cal.App.4th 1169 (*Wallace*) and *Taus*, *supra*, 40 Cal.4th 683. *Wallace* involved mixed causes of action, i.e., causes of action "where the plaintiff has based liability on both protected and unprotected activity." (*Wallace*, *supra*, 196 Cal.App.4th at p. 1196.) *Wallace* explained mixed causes of action arise from protected activity within the meaning of the anti-SLAPP statute unless the protected activity is merely incidental to the unprotected activity. (*Id.* at p. 1187.) Concluding that the mixed causes of action at issue in *Wallace* were subject to anti-SLAPP scrutiny, the Court of Appeal turned to the question of "what a plaintiff must do to show a probability of prevailing" on such a claim, explaining its reading of the statutory scheme would require the plaintiff to "show a probability of prevailing on the assertion of liability based on protected activity, and nothing else." (*Id.* at pp. 1199-1200.) Stated differently, the Court of Appeal's preferred rule would "require[] the plaintiff to demonstrate a probability of prevailing on his or her attempt to base liability on protected activity, and [would not] permit the plaintiff to proceed with a claim targeting protected activity merely because the plaintiff may have also alleged a potentially meritorious claim based on unprotected activity." (*Id.* at p. 1202.)

The Court of Appeal reasoned such a rule would be consistent with our Supreme Court's decision in *Taus*, *supra*, 40 Cal.4th 683, a case that did not involve mixed causes of action, explaining: "Given that a meritorious claim of protected activity could not save a meritless claim of protected activity in *Taus*, a meritorious claim of *un*protected activity should not be able to save a meritless assertion of protected activity in a mixed

cause of action." (*Wallace*, *supra*, 196 Cal.App.4th at p. 1210.)  However, as the Court of Appeal in *Wallace* acknowledged, our Supreme Court implicitly overruled *Taus* in *Oasis*, *supra*, 51 Cal.4th 811:  "*Oasis* clearly holds that, where a cause of action (count) is based on protected activity, the entire cause of action may proceed as long as the plaintiff shows a probability of prevailing on at least one of the asserted bases for liability." (*Wallace*, *supra*, 196 Cal.App.4th at p. 1211.)  While *Oasis*, like *Taus*, did not involve mixed causes of action, the Court of Appeal in *Wallace* nevertheless applied the rule because "*Oasis* did not explicitly limit the application of the *Mann* rule to causes of action that were based solely on protected activity." (*Id*. at p. 1212.)  Thus, *Wallace* applied the rule Nair argues we should decline to apply.

Nair's position does find some support in *City of Colton v. Singletary* (2012) 206 Cal.App.4th 751 (*Singletary*), in which the Court of Appeal held certain allegations within two causes of action (for unfair business practices and injunctive relief) relating to protected activity, i.e., filing a lawsuit in violation of Code of Civil Procedure section 128.7, and concerning which the plaintiff did not show a probability of prevailing on the merits, "may be parsed from the causes of action and stricken, while the allegations related to non-protected activity [i.e., bribery] may remain as part of the complaint." (*Id*. at pp. 772-773.)  *Singletary* is distinguishable as that case involved mixed causes of action.  We also disagree with the decision.  As Justice Richli points out in her concurring and dissenting opinion: "The SLAPP Act authorizes a trial court to strike a 'cause of action.' [Citation.]  It 'cannot be used to strike particular allegations within a cause of action. [Citation.]' [Citations.]  This is implicit in the gravamen test; otherwise, rather than determining the gravamen of a cause of action [to determine whether a mixed cause of action is subject to anti-SLAPP scrutiny], a court could simply strike any allegations based on protected activity, while allowing allegations of unprotected activity to stand. [¶]  Nevertheless, the majority concludes that it can and should strike isolated allegations,

24

citing [*Taus*, *supra*, 40 Cal.4th 683]. *Taus*, however, does not support the majority's position." (*Singletary*, *supra*, 206 Cal.App.4th at pp. 792-793 [conc. & dis. opn. of Richli, J.].)

Justice Richli continued: "It is vital to remember the procedural posture of *Taus*. The trial court granted the defendants' SLAPP motion with respect to some causes of action but denied it with respect to others, including causes of action for invasion of privacy and for defamation. [Citation.] [¶] The Court of Appeal held that 'the activities of defendants that gave rise to plaintiff's action . . . were acts in furtherance of defendants' right of free speech for purposes of the anti-SLAPP statute.' [Citation.] It then turned to whether the plaintiff had established a probability of prevailing. [Citation.] The Court of Appeal viewed the invasion of privacy cause of action as 'potentially implicat[ing] . . . two distinct tort theories' -- public disclosure of private facts and intrusion into private matters. [Citation.] It ruled that the plaintiff had shown a probability of prevailing: [¶] (1) On her 'public disclosure of private facts' theory based on certain alleged disclosures, but not others [citation]; [¶] (2) On her 'intrusion into private matters' theory based on certain alleged intrusions, but not others [citation]; and [¶] (3) On her defamation cause of action based on certain alleged statements, but not others [citation]. [¶] It concluded that, while most of the plaintiff's 'claims' should have been 'dismissed,' certain 'claims' -- meaning certain causes of action, to the extent that they were based on certain factual allegations -- 'could go forward . . . .' [Citation.] [¶] The Supreme Court held that the plaintiff showed a probability of prevailing with respect to only one cause of action (for intrusion into private matters), based on only one alleged intrusion (using intentional misrepresentations to obtain personal information about the plaintiff). [Citation.] [¶] Significantly, however, the court did not address the propriety of 'dismissing' particular allegations of the complaint. To the contrary, it stated: '[T]he Court of Appeal held that plaintiff failed to establish such a probability of prevailing with

25

regard to the bulk of defendants' conduct to which the complaint was directed, and plaintiff did not seek review of the appellate court's decision. Accordingly, the claims found deficient by the Court of Appeal are not before us. *The issues before us are limited to those claims as to which the Court of Appeal found that plaintiff adequately had established a prima facie case to avoid dismissal under section 425.16.*" [Citation.] [¶] Thus, it does not appear that any party was arguing that the Court of Appeal's approach was erroneous. "'[I]t is axiomatic that cases are not authority for propositions not considered." [Citation.]' [Citation.] Had the Supreme Court really intended to change the well-established rule that the SLAPP Act cannot be used to strike particular allegations, surely it would have said it was doing so and explained why. At a minimum, it would have had to justify taking such a step in the face of the plain language of the SLAPP Act." (*Singletary*, *supra*, 206 Cal.App.4th at pp. 792-793 [conc. & dis. opn. of Richli, J.]; see also *Wallace*, *supra*, 196 Cal.App.4th at pp. 1219 [conc. & dis. opn. of Jones, J.] ["*Taus* never analyzed the propriety of striking some, but not all, alleged wrongful acts supporting a cause of action"].)

We agree with Justice Richli's assessment and respectfully disagree with the majority opinion in *Singletary*, *supra*, 206 Cal.App.4th 751. Moreover, even if we were to agree with *Singletary's* characterization of *Taus*, *supra*, 40 Cal.4th 683, we are bound to follow the more recent Supreme Court case of *Oasis*, *supra*, 51 Cal.4th 811. Thus, if Dr. Burrill "'can show a probability of prevailing on *any part of* [*her*] *claim*, the cause of action is not meritless' and will not be stricken . . . .'" (*Oasis*, *supra*, 51 Cal.4th at p. 820.)

There is no dispute that we must review the trial court's ruling denying Nair's anti-SLAPP motion de novo. (*Mendoza v. Wichmann* (2011) 194 Cal.App.4th 1430, 1447.) Applying our independent judgment, we conclude Dr. Burrill has demonstrated a probability of prevailing on her defamation claim. We turn to this analysis now.

26

## II

### *Probability of Prevailing on the Claim*

"'Defamation is an invasion of the interest in reputation. The tort involves the intentional publication of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage.' [Citation.]" (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 27.) Defamation has two forms, libel and slander. (Civ. Code, § 44.) Defamatory publications that are made "by writing, printing, picture, effigy, or other fixed representation to the eye," are considered libel. (Civ. Code, § 45.) Slander involves defamatory publications that are "orally uttered," and also includes "communications by radio or any mechanical or other means." (Civ. Code, § 46.)

Where a libelous statement "is defamatory *on its face*, it is said to be libelous per se, and actionable without proof of special damage. But if it is defamation *per quod*, i.e., if the defamatory character is not apparent on its face and requires an explanation of the surrounding circumstances (the 'innuendo') to make its meaning clear, it is not libelous per se, and is not actionable without pleading and proof of special damages." (5 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 541, p. 794; see Civ. Code, § 45a.) Similarly, certain slanderous statements are considered slanderous per se, and actionable without proof of special damage. However, the slander statute expressly limits slander per se to four categories of defamatory statements, "including statements (1) charging the commission of crime, or (2) tending directly to injure a plaintiff in respect to the plaintiff's [profession, trade, or] business by imputing something with reference to the plaintiff's [profession, trade, or] business that has a natural tendency to lessen its profits." (*Mann*, *supra*, 120 Cal.App.4th at pp. 106-107; see Civ. Code, § 46.) And while libel per se is not so limited, courts have held the foregoing categories of defamatory statements to also constitute libel per se. (See *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1127 ["false accusations of crime are libel per se"]; *Barnes-Hind, Inc. v. Superior Court* (1986)

27

181 Cal.App.3d 377, 385 [false accusations of "'dishonesty or questionable business methods'" are libel per se].)

Here, Dr. Burrill sued Nair for both libel (the online postings and neighborhood flyer) and slander (the radio interview). In defending against the anti-SLAPP motion below, Dr. Burrill did not address the statements made in the neighborhood flyer. And because she need not show a probability of prevailing on each part of her defamation claim (see *Oasis*, *supra*, 51 Cal.4th at p. 820), we shall not address those statements in this opinion. For the same reason, we need not assess the defamatory nature of each statement made in the online postings and radio interview. Instead, we discuss only those statements accusing Dr. Burrill of extortion, prescribing medication without a license, perjury, and selling child custody recommendations. As we explain, these statements are defamatory per se.

## A.

### *Defamatory Nature of the Statements*

Defamation requires the intentional publication of a false statement of fact that has a natural tendency to injure the plaintiff's reputation or that causes special damage. (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645; *Raghavan v. Boeing Co.* (2005) 133 Cal.App.4th 1120, 1132.) As mentioned, false statements charging the commission of crime, or tending directly to injure a plaintiff in respect to his or her profession by imputing dishonesty or questionable professional conduct are defamatory per se. (See *Mann*, *supra*, 120 Cal.App.4th at pp. 106-107 [slander per se]; see also *Weinberg v. Feisel*, *supra*, 110 Cal.App.4th at p. 1127 [libel per se]; *Barnes-Hind, Inc. v. Superior Court*, *supra*, 181 Cal.App.3d at p. 385 [libel per se].)

Among other things, Nair's rightsformothers.com blog post asserts investigators with the Department of Consumer Affairs "have uncovered evidence of fraudulent conspiracy. [¶] They have met with over a dozen victims and recorded their stories [¶]

28

They have uncovered evidence of financial fraud and evidence of $$$ corruption.  [¶] The District Attorney's office is now involved.  All of Burrill[']s cronies, friends in her PAS [Parental Alienation Syndrome] cottage industry cannot bury real evidence. . . .  [¶] . . . This is the beginning of the end to the corrupt LCS [*sic*] practice by Janelle Burrill. All her past reports and recommendations to the courts in her fraudulent career will be thrown out."

Similarly, Nair's CNN iReport postings allege Dr. Burrill "perpetuates criminal fraud and Modern Day Slavery using Parental Alienation SCAM, enslavement of children for $$$$$$ in California."  He continues:  "Corrupt criminals like Janelle Burrill and their good-ol-network are today's 'modern slave traders' trading 'children' with vindictive retribution and for money."  He further charges:  "Janelle Burrill conspired, fabricated DV [domestic violence] allegations, enslaved & abused child[ren], deliberately and maliciously lied under oath to commit willfull [*sic*] perjury at Placer County Superior Court.  Perpetuated a crime against this family.  Pathological lying for money, Larceny, Extortion & racketeering."

In Nair's interview with KFBK radio, he claimed Dr. Burrill "extorted money" from him, explaining:  "She wanted $4,000.00 for services she never rendered to us."  He continued:  "Credential-wise, she does not have any license to practice psychology in California.  She's got a diploma from some online mill.  And on top of it, she makes DSM-[IV] diagnoses; she prescribed Benzodiazepine for my son.  A person who is not even a psychologist or psychiatrist prescribing medication in California?  That's illegal."

Nair argues these statements are "largely rhetoric and opinion."  He is mistaken.  It is true, as he points out, that only statements of fact are actionable as defamation, while statements of opinion are constitutionally protected.  (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 384.)  However, "where an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation."  (*Summit Bank*

29

*v. Rogers* (2012) 206 Cal.App.4th 669, 696.) "Whether a statement declares or implies a provably false assertion of fact is a question of law for the court to decide [citations], unless the statement is susceptible of both an innocent and a libelous meaning, in which case the jury must decide how the statement was understood [citations]." (*Franklin v. Dynamic Details, Inc.*, *supra*, 116 Cal.App.4th at p. 385.) In determining whether the statements in this case declare or imply provably false factual assertions, we use a "totality of the circumstances test," which requires an examination of both the language of the statements and the context in which they were made. (*Ibid*.)

Beginning with the language, the statements charge Dr. Burrill with criminal conduct, i.e., extortion (Pen. Code, § 518), perjury (Pen. Code, § 118), accepting money to influence her testimony regarding child custody matters (Pen. Code, § 138, subd. (b)), and prescribing a controlled substance without a license (Health & Saf. Code, § 11153). Such statements are defamatory per se.

Nevertheless, citing *Rudnick v. McMillan* (1994) 25 Cal.App.4th 1183 (*Rudnick*), Nair points out that "'where potentially defamatory statements are published in a public debate, a heated labor dispute, or in another setting in which the audience may anticipate efforts by the parties to persuade others to their positions by use of epithets, fiery rhetoric or hyperbole, language which generally might be considered as statements of fact may well assume the character of statements of opinion.'" (*Id.* at pp. 1191-1192, quoting *Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 601.) While true, the *Rudnick* court continued: "'[S]hort of *accusations of crime or personal dishonesty*, the First Amendment protects even sharp attacks on the character, motives, or moral qualifications of "a public officer or . . . active participant in a labor dispute."' [Citation.] 'There is an analogous leeway for criticism of an individual who voluntarily injects himself or herself into public controversy and so becomes a "public figure." [Citation.]' [Citation.]" (*Rudnick*, *supra*, 25 Cal.App.4th at p. 1192, italics added.) Nair accused

30

Dr. Burrill of committing several crimes and behaving dishonestly in her profession. The First Amendment does not protect that.

Nor are we persuaded by Nair's reliance on *Carver v. Bonds* (2005) 135 Cal.App.4th 328 (*Carver*). There, Barry Bonds was quoted in a newspaper article stating he did not like the plaintiff, a San Francisco podiatrist who had supplied him with orthotics, and calling him "'a liar.'" (*Id*. at p. 341.) The Court of Appeal held this to be "protected opinion," explaining that "in the context of an outspoken athlete's flippant remarks before a game about someone he dislikes, the word 'liar' would seem to be merely an expression of contempt [citation], and the sort of '"broad, unfocused and wholly subjective comment"' that is generally regarded as protected opinion [citation]." (*Id*. at p. 347; see also *Rosenaur v. Scherer* (2001) 88 Cal.App.4th 260, 278-279 ["use of the words 'thief' and 'liar' in the course of a chance confrontation with a political foe at a shopping center was the type of loose, figurative, or hyperbolic language that is constitutionally protected"].)

In so holding, the *Carver* court distinguished *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1 [111 L.Ed.2d 1], in which the United States Supreme Court held "the plaintiff could maintain a defamation action for a newspaper opinion column branding him as a liar because the article implied that he had committed perjury in a particular case, and the alleged falsity of the charge could be determined 'on a core of objective evidence.' [Citation.]" (*Carver*, *supra*, 135 Cal.App.4th at p. 346.) Here, Nair accused Dr. Burrill of committing perjury in his particular case. He also accused her of extorting money from him, accepting money to influence her child custody recommendations, and prescribing Benzodiazepine to his son without a license. This is not "the sort of '"broad, unfocused and wholly subjective comment"' that is generally regarded as protected opinion." (*Id*. at p. 347.)

31

We also reject Nair's reliance on *Ruiz v. Harbor View Community Assn.* (2005) 134 Cal.App.4th 1456 (*Ruiz*). Indeed, there, the Court of Appeal held "statements that Ruiz acted unconscionably and in violation of his ethical duties as a lawyer are not mere hyperbole, epithet, or 'subjective expressions of disapproval, devoid of any factual content.' [Citation.] This becomes clear when the statements are viewed in context. The statements contend Ruiz violated a specific code section based upon identified conduct." (*Id*. at p. 1472.) Similarly, here, Nair's statements allege that Dr. Burrill committed a number of specific crimes.

Of course, Nair cites the portion of the *Ruiz* opinion in which the court held certain statements to be nonactionable hyperbole, i.e., "Ruiz was seeking a 'Shakespearian "pound of flesh,"' making 'cockamam[ie]' document inspection requests, and 'virtually stalking and staring down the directors at their regularly scheduled meetings.' The term 'virtually stalking' cannot fairly be interpreted as an accusation of a crime but, taken in context, was a metaphor used to describe Ruiz's conduct at the board meetings." (*Ruiz*, *supra*, 134 Cal.App.4th at pp. 1472-1473; see also *Letter Carriers v. Austin* (1974) 418 U.S. 264, 283-284 [41 L.Ed.2d 745] ["'traitor[s]'" understood to mean plaintiffs' actions were reprehensible, not that plaintiffs had committed treason]; *Greenbelt Coop. Pub. Assn. v. Bresler* (1970) 398 U.S. 6, 13-14 [26 L.Ed.2d 6] ["'blackmail'" a vigorous epithet used to describe unreasonable negotiations].) Here too, certain of Nair's statements might be characterized as hyperbole. If so, no reasonable reader of the online postings would believe Nair was accusing Dr. Burrill of the "enslavement of children." Thus, one way, in context, to view the postings might be to consider them to allege that she accepted money to offer false testimony before the family court and fabricated domestic violence accusations in order to have children placed with the parent willing to pay for her perjured testimony. This might be characterized as what Nair rhetorically termed "enslavement of children." It does not really matter because, even if Nair was not

32

actually accusing Dr. Burrill of child slavery, he was still accusing her unambiguously of criminal conduct. And, as we have explained, this was not the only crime Nair accused Dr. Burrill of committing.

In sum, Nair's statements charge Dr. Burrill with criminal conduct. If false, they constitute defamation per se. We turn now to the question of whether Dr. Burrill submitted sufficient evidence to substantiate the falsity of the statements and conclude that she did.

## B.

### *Falsity*

"'The sine qua non of recovery for defamation . . . is the existence of falsehood.' [Citation.]" (*Franklin v. Dynamic Details, Inc.*, *supra*, 116 Cal.App.4th at p. 384.) As mentioned, in order to defeat Nair's anti-SLAPP motion, Dr. Burrill was required to support her defamation claim with a sufficient prima facie showing of facts to sustain a favorable judgment. (*Oasis*, *supra*, 51 Cal.4th at p. 820.) In determining whether Dr. Burrill made a sufficient prima facie showing that Nair's accusations of criminal conduct were false, we accept as true all evidence favorable to Dr. Burrill and assess Nair's evidence only to determine if it defeats Dr. Burrill's submission as a matter of law. (*Grewal v. Jammu*, *supra*, 191 Cal.App.4th at p. 989.)

Dr. Burrill submitted a declaration in opposition to the anti-SLAPP motion in which she: (1) denied extorting money from Nair and explained the dispute they had over the fee agreement; (2) denied prescribing medication to Suraj or anyone else; (3) denied committing perjury; and (4) denied accepting money to influence her child custody recommendations. If credited, Dr. Burrill's declaration establishes Nair's allegations to the contrary are false.

But Dr. Burrill submitted additional evidence. With respect to the extortion charge, she submitted the financial agreement Nair signed in October 2008. She also

33

submitted her correspondence with Nair in which she explained she initially quoted him $150 per hour under the mistaken belief she was Suraj's individual therapist, as opposed to the reunification therapist, attached a new fee agreement for $165 per hour plus a $1,500 retainer for report preparation, document review, and contact with collateral sources, and demanded $4,642.50 for services rendered. Dr. Burrill further submitted Nair's e-mail response, in which he disputed all charges except for $600 that was "pre-authorized by father" and explained this sum was paid in full ($300 paid by Nair and the other $300 paid by Suraj "from his personal chess prize monies"). "Extortion is the obtaining of property from another, with his consent, or the obtaining of an official act of a public officer, induced by wrongful use of force or fear, or under color of official right." (Pen. Code, § 518.) These facts, which appear to be the basis of Nair's charge that Dr. Burrill extorted money from him, do not come close to establishing the crime of extortion.

Nair argues that because Dr. Burrill "was seeking over $4,000.00 from [him], and after he refused to pay she issued a report that resulted in him losing all contact with his son, it certainly appears she was extorting money from him." Not so. First, extortion is not the *seeking* of property from another by wrongful means, it is the *obtaining* of property by such means. Nair does not dispute that the money he paid Dr. Burrill was authorized by the initial fee agreement. And he did not pay her for any of the disputed charges. Second, even if we construe Nair's statement as charging the crime of attempted extortion, Dr. Burrill has still produced a sufficient prima facie showing that it is false. As mentioned, Nair claimed she "wanted $4,000.00 for services she never rendered to us." Dr. Burrill submitted an accounting of the services she rendered. Thus, if Dr. Burrill's evidence is credited, the basis of Nair's charge of attempted extortion is "'false and demeaning.'" (*Franklin v. Dynamic Details, Inc.*, *supra*, 116 Cal.App.4th at

34

pp. 387-388 [accusation of criminal activity is not actionable if the underlying facts are disclosed, unless "'the stated facts are themselves false and demeaning'"].)

With respect to the charge of prescribing Benzodiazepine to Suraj, in addition to her declaration denying the charge, Dr. Burrill submitted a declaration from Janak Mehtani, M.D., who treated Suraj between April and September 2009. Dr. Mehtani explained that he prescribed "the lowest available dosage of Zyprexa" as "a mood stabilizer to hopefully help with [Suraj's] depression." Zyprexa "is not a benzodiazepine"; nor is it a controlled substance. Dr. Mehtani further explained: "I never had any conversation with [Dr. Burrill] nor received anything in writing from her with regard to what medication I should prescribe to [Suraj]. Although she spoke to me about her patient and attended my August 7, 2009 session with Suraj [*sic*] at no time did [Dr. Burrill] recommend or suggest that I prescribe Benzodiazepine or any other prescription drug to Suraj." This declaration, in conjunction with that of Dr. Burrill, provides a sufficient prima facie showing that Nair's charge of prescribing Benzodiazepine without a license was false.

Nair argues that his statement charging Dr. Burrill with illegally prescribing Benzodiazepine to Suraj is true because he was discussing the criminal complaint he filed, which "alleges that [Dr. Burrill] recommended benzodiazepine and conspired with Dr. Mehtani to prescribe it to Suraj. It alleges that [Dr. Burrill] 'has increased her abuse of my child by conspiring with Janak Mehtani & forcing my son on unnecessary meds.' This was consistent with Dr. Blanco's testimony that [Dr. Burrill] had recommended 'antipsychotic medication' against Dr. Blanco's judgment. Statements regarding the allegations of the criminal complaint are thus true and cannot be a basis for defamation." This argument misses the point. The fact that Nair filed a criminal complaint alleging Dr. Burrill "conspired" with, and "made recommendations" to, Dr. Mehtani concerning

35

prescribing Benzodiazepine to Suraj does not transform the very different allegation that she illegally "prescribed" this medication herself into a true statement.

Finally, with respect to Nair's accusations Dr. Burrill committed perjury and accepted money to influence her child custody recommendations, we conclude her denial of these charges in her declaration provides a sufficient prima facie showing that the accusations are false. Nor does Nair's evidence in support of his anti-SLAPP motion defeat her submission as a matter of law. (See *Grewal v. Jammu*, *supra*, 191 Cal.App.4th at p. 989.) For instance, Nair cites certain portions of Dr. Burrill's testimony in the family law matter and points to evidence this testimony was false. However, the crime of perjury requires more than false testimony. It requires that the perjurer knows the testimony to be false. (Pen. Code, § 118.) Thus, even if Nair's evidence is credited, it does not establish that Dr. Burrill knowingly gave false testimony. Whether Dr. Burrill committed perjury, and in turn whether Nair's accusation she committed perjury is false, are questions for the trier of fact. In other words, evidence that raises doubts about the veracity of certain portions of Dr. Burrill's testimony does not, as a matter of law, establish that Nair's charge of perjury is true. Moreover, the import of Nair's defamatory statements is that Dr. Burrill committed perjury with respect to child custody recommendations in exchange for money. Nair offers no evidence that Dr. Burrill was paid for false testimony.

Having concluded that Dr. Burrill made a sufficient prima facie showing of falsity, we turn now to the question of whether such a showing was made with respect to the element of actual malice.

## C.

### *Actual Malice*

A public figure suing for defamation "must demonstrate 'actual malice' by clear and convincing evidence." (*Christian Research Institute v. Alnor* (2007) 148

Cal.App.4th 71, 84 (*Christian Research*).) Actual malice "requires a showing that the allegedly false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.' [Citation.] The reckless disregard standard requires a 'high degree of awareness of . . . probable falsity . . . .' [Citation.]" (*Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1167 (*Annette F.*).) "The question is not "'whether a reasonably prudent [person] would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.'" [Citation.]" (*Christian Research*, *supra*, 148 Cal.App.4th at p. 84.) "'The burden of proof by clear and convincing evidence "requires a finding of high probability. The evidence must be so clear as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind.'" [Citation.]" (*Ibid.*)

As mentioned, Dr. Burrill concedes she is a limited purpose public figure, and must therefore establish actual malice by clear and convincing evidence at trial. (See *Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1578-1579.) Thus, in order to successfully defend against Nair's anti-SLAPP motion, she must "establish a probability that she will be able to produce clear and convincing evidence of actual malice." (*Annette F.*, *supra*, 119 Cal.App.4th at p. 1167.) Stated differently, we must determine whether Dr. Burrill has made a sufficient prima facie showing of facts to sustain her burden of demonstrating a high probability that Nair published the defamatory statements with knowledge of their falsity or while entertaining serious doubts as to their truth. (See *Colt v. Freedom Communications, Inc.* (2003) 109 Cal.App.4th 1551, 1557; *Annette F.*, *supra*, 119 Cal.App.4th at p. 1169 [defamation plaintiff bears "the burden of making a

37

'sufficient prima facie showing of facts to sustain a favorable judgment' on the issue of actual malice"].) We conclude Dr. Burrill has made such a showing.

"Actual malice may be proved by direct or circumstantial evidence. Factors such as failure to investigate, anger and hostility, and reliance on sources known to be unreliable or biased 'may in an appropriate case, indicate that the publisher himself had serious doubts regarding the truth of his [or her] publication.'" (*Annette F.*, *supra*, 119 Cal.App.4th at p. 1167, quoting *Reader's Digest Assoc. v. Superior Court* (1984) 37 Cal.3d 244, 257-258.) "Thus, malice may be inferred where, for example, 'a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call.' [Citation.] Similarly, an inference of malice may be drawn 'when the publisher's allegations are so inherently improbable that only a reckless [person] would have put them in circulation[,] . . . [or] where there are obvious reasons to doubt the veracity of the informant or the accuracy of his [or her] reports. [Fn. omitted.]' [Citation.] Conversely, '[t]he failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice, nor even necessarily raise a triable issue of fact on that controversy. [Citations.] Similarly, mere proof of ill will on the part of the publisher may likewise be insufficient. [Citation.]'" (*Christian Research*, *supra*, 148 Cal.App.4th at p. 85, quoting *Reader's Digest*, *supra*, 37 Cal.3d at p. 258.)

### 1. *Anger and Hostility*

There is an abundance of evidence of Nair's anger and hostility towards Dr. Burrill. In a series of e-mails, Nair expressed animosity towards nearly everyone in the family court system, including "the prejudicial [Commissioner] Amara, his good old network [and] any of the unscrupulous lawyers on leashes." Nair also expressed resentment towards David Chervick, one of Suraj's former therapists, whom he accused of "accepting bribes" and "making erroneous recommendations to destroy [his] boys." As mentioned, Nair previously sought to disqualify Commissioner Amara from the case,

38

asserting he made "prejudicial and biased rulings" because of "overt prejudice, covert racism/discrimination and [his] vindictive retribution towards [Nair]." These charges were found to be unsupported by the evidence. His accusation of bribery against Chervick was found to be "outrageous." Nevertheless, in his final e-mail to Dr. Burrill, Nair stated he wanted her to recommend a "50/50 custody plan" and warned: "If you continue to pursue your money making schemes, covert racism and ongoing misconduct I will follow up with the appropriate oversight agencies *and the media* knowing very well that the prejudicial Amara is a good friend of yours." He concluded: "I will stand up for my children, protect them and stand up against greed, racism and prejudice of the good old network. Its [*sic*] unfortunate that my children, family, community now feel that Amara and his friends like you represent the Klan operating without hoods in black robes instead of white."

Nair's anger and hostility only increased when Dr. Burrill filed the reunification report and testified in support of the restraining order that resulted in Suraj's removal from his custody. Indeed, in his declaration in support of the anti-SLAPP motion, Nair blames Dr. Burrill's report and testimony for the loss of custody of his son. We conclude the evidence of Nair's malevolence towards Dr. Burrill is so clear as to leave no substantial doubt. However, "[a] court may consider a defendant's anger or hostility toward a plaintiff in determining the presence of malice only to the extent it impacts the defendant's *actual belief* concerning the truthfulness of the publication." (*Christian Research*, *supra*, 148 Cal.App.4th at p. 92.) Here, as mentioned, Nair's hostility towards Commissioner Amara and Chervick prompted him to fabricate baseless charges against them. And as we explain immediately below, there is also evidence that Nair fabricated the charges leveled against Dr. Burrill.

## 2. *Fabrication*

Actual malice can be shown "where, for example, 'a story is fabricated by the defendant, [or] is the product of his [or her] imagination . . . .' [Citation.]" (*Christian Research*, *supra*, 148 Cal.App.4th at p. 85.) For example, in *Christian Research*, Alnor was sued for defamation after publishing an online article claiming the president of a religious organization (CRI) was the focus of a federal criminal mail fraud investigation. The alleged mail fraud was based on a letter posted on CRI's web site claiming certain mail had been misdirected by the local post office and discarded by the recipient, causing the organization to lose a substantial amount of money, and asking for donations to cover the loss. (*Id*. at pp. 76-77.) In support of his anti-SLAPP motion, Alnor submitted a declaration stating, among other things, that "Debra" at the postal inspector's office in Pasadena told him that "her office was '"investigating" [CRI's claims of mail misdirection] on the basis of "mail fraud."'" (*Id*. at p. 77.) In opposition to the motion, CRI submitted letters received from the Office of the Inspector General, Federal Trade Commission, and Federal Bureau of Investigation, in response to CRI's Freedom of Information Act (FOIA) request. Each letter stated the agency had not located investigative records concerning CRI or its president during the preceding two-year period. (*Id*. at p. 79.)

The Court of Appeal found an inference of fabrication arose from the FOIA responses: "Specifically, one may reasonably infer from the [United States Postal Service's] inability to locate records of an investigation centering on either of the plaintiffs that no investigation had been launched. From that, one may reasonably infer that Debra in the Pasadena postal inspector's office would not have told Alnor an investigation had been launched, giving rise to the further inference that Alnor either never spoke with anyone named Debra, or that he simply attributed statements to Debra which he knew she never made." (*Christian Research*, *supra*, 148 Cal.App.4th at p. 85.)

40

However, the court went on to conclude this inference of fabrication "lack[ed] sufficient strength to meet the clear and convincing standard." (*Id*. at p. 87.) This was so for two reasons. First, the FOIA response "does not purport to foreclose the possibility that documents pertaining to the investigation Debra mentioned may exist, but are kept in a location other than those searched," e.g., in the Pasadena office. (*Id*. at p. 88.) Second, the response "does not negate the possibility that Alnor simply misunderstood Debra. Specifically, Debra's statement that 'she was aware of the claims in [the CRI] fundraising letter and that her office was "investigating" it on the basis of "mail fraud,"' was ambiguous. One could reasonably interpret the statement to mean either that her office was investigating whether the purported misdirection of mail constituted mail fraud, or was investigating whether the letter itself constituted mail fraud. Plaintiffs do not contend, and have cited no evidence suggesting, Alnor considered Debra's statement to be the former. Alnor might have carelessly interpreted Debra's statement, but this would not establish malice. 'Gross or even extreme negligence will not suffice to establish actual malice; the defendant must have made the statement with knowledge that the statement was false or with "actual doubt concerning the truth of the publication."' [Citation.]" (*Ibid*.)

In this case, there arises an unambiguous inference of fabrication. Unlike *Christian Research*, where Alnor named a source for his charge that CRI's president was under investigation for mail fraud, here, Nair cites no source for his accusations that Dr. Burrill fabricated domestic violence allegations and accepted money to influence her child custody recommendations. He simply says so. A reasonable jury could conclude these charges were the product of his imagination. And while Nair cites Suraj as the source for his accusation that Dr. Burrill illegally prescribed Benzodiazepine without a license, review of the letters Suraj wrote to Nair reveals Suraj said no such thing. Indeed, according to Nair's own summary of their content, they "indicate that Suraj is scared, that

41

he is afraid he may be being medicated against his will, and that he believed [Dr. Burrill] had been lying about [Nair]." This is a far cry from claiming that Dr. Burrill had prescribed Benzodiazepine to him. Moreover, even had Suraj made this claim, "'there are obvious reasons to doubt the veracity of [Suraj] or the accuracy of his reports'" (*Christian Research*, *supra*, 148 Cal.App.4th at p. 85), especially in light of the fact that he was forcibly removed from Nair's home in handcuffs, placed in a psychiatric facility, and ultimately released into the custody of his mother, someone he repeatedly referred to as "that thing" in the letters.[5]

As a second source for his accusation that Dr. Burrill illegally prescribed medication to Suraj, Nair cites Dr. Blanco's deposition testimony, in which he states Dr. Burrill "recommended" Suraj be given antipsychotic medication, but Dr. Blanco disagreed and did not prescribe any such medication. This statement does not support the accusation that Dr. Burrill took it upon herself to prescribe medication to Suraj. Moreover, in the criminal complaint Nair filed against Dr. Burrill, he does not accuse her of illegally prescribing medication, but instead claims she "conspired with [Dr. Mehtani] to effectuate/prescribe unnecessary and harmful drugs" and "made recommendations of

---

[5] The trial court did not consider these letters in ruling on the anti-SLAPP motion. Nair asserts this was error. Nair also faults the trial court for declining to consider statements made in Nair's declaration concerning: (1) Dr. Blanco's deposition testimony in the underlying custody matter, which was stricken by the family court; (2) the surreptitious recording of Suraj's December 2, 2008, therapy session with Dr. Burrill, which was sealed by the family court; (3) Nair's understanding that Dr. Burrill's certification with the American Board of Examiners in Clinical Social Work was revoked in March 2010 because she did not report, at the time of recertification in June 2009, a complaint had been filed against her with the BBS; (4) Nair's understanding that the DCA/BBS investigation of Dr. Burrill was ongoing; and (5) Nair's belief that he was not the only person who believed Dr. Burrill was corrupt or had committed perjury. We need not address these evidentiary rulings because our standard of review is de novo. And assuming, without deciding, Nair's declaration should be considered in its entirety, we still conclude Dr. Burrill made a sufficient prima facie showing of facts to sustain her burden of demonstrating actual malice by clear and convincing evidence.

forcing [Suraj] on medication benzodiazepine." The fact that these allegations fall short of accusing Dr. Burrill of illegally prescribing Benzodiazepine for Suraj supports a strong inference that Nair, either knowing Dr. Burrill had not prescribed the drug or doubting whether she had done so, fabricated the charge in the radio interview.

Nevertheless, citing *Annette F.*, *supra*, 119 Cal.App.4th 1146, Nair argues "[t]he statement that [Dr. Burrill] 'prescribed' the drug is 'not so far from the truth as to permit an inference of actual malice by clear and convincing evidence . . . .'" We disagree. In *Annette F.*, the allegedly defamatory statement claimed Annette was "a 'convicted perpetrator of domestic violence,'" when the reality was that she "was found by the family court to have committed domestic violence." (*Annette F.*, *supra*, 119 Cal.App.4th at p. 1170.) The Court of Appeal first noted three factors Annette relied upon to establish a prima facie showing of actual malice: "(1) Sharon felt extreme anger and hostility toward Annette; (2) Sharon was 'stung by the negative reaction' to [the Court of Appeal's decision in *Sharon S. v. Superior Court* (2001) 93 Cal.App.4th 218, revd. (2003) 31 Cal.4th 417] in the gay and lesbian community and was 'overwhelmed by the desire to salvage her own reputation at the expense of Annette's; and (3) Sharon's allegedly defamatory statement 'was not uttered in the heat of argument' and 'she had ample opportunity to check the accuracy' of the statement." (*Annette F.*, *supra*, 119 Cal.App.4th at p. 1169.)

Finding these factors did not establish a probability of proving actual malice by clear and convincing evidence, the court explained: "In our view, a critical consideration in determining the weight to be given such factors is the extent to which the allegedly defamatory statement deviates from the truth. False statements that are completely 'fabricated by the defendant' or 'so inherently improbable that only a reckless [person] would have put them in circulation' are particularly likely to have been made with actual malice. [Citations.] [¶] On the other hand, false statements that have some element of

truth to them are logically less susceptible to such a finding. In this case, it is undisputed that Annette admitted that she had hit Sharon, that she was found by the family court to have committed domestic violence, and that she was the subject of a restraining order. In these circumstances, Sharon's statement that Annette was a 'convicted perpetrator of domestic violence' was not so far from the truth as to permit an inference of actual malice by clear and convincing evidence, even considering the additional evidence of hostility, alleged motive, and lack of investigation." (*Annette F.*, *supra*, 119 Cal.App.4th at pp. 1169-1170.)

In this case, as mentioned, there is an abundance of evidence of Nair's hostility towards Dr. Burrill. Also like *Annette F.*, there is evidence of motive to harm Dr. Burrill's reputation. Indeed, in the rightsformothers.com blog post, after suggesting the Attorney General would be starting a criminal investigation of Dr. Burrill, Nair advises his readers to "[t]ake the [Attorney General's] report back to the courts once it is public to nullify any bull shit she filed with the courts." This evidences his motive to overturn the family court decisions that removed Suraj from his custody. There is also evidence of a lack of investigation into whether anyone, let alone Dr. Burrill, prescribed Benzodiazepine to Suraj. In Nair's deposition testimony, he admitted the medical records he obtained from Dr. Mehtani's office were "very hard and difficult to read. It is about five or six pages of handwritten scribbles . . . . [¶] . . . [¶] . . . which allude to a lot of medication in that document. I cannot read and interpret specifically what medication it is. It has Burrill in there. It has Burrill written all over those documents. But it doesn't have, what do you call, my ability to comprehend the quantity and the name. We actually showed it to many physicians also and they could not figure out what the medicine name was. We will find out once we depose [Dr. Mehtani]." Yet despite his admitted lack of information, Nair went on the radio and accused Dr. Burrill of illegally prescribing Benzodiazepine for his son.

And contrary to Nair's argument on appeal, unlike *Annette F.*, there is an enormous difference between recommending a medication and illegally prescribing a medication without a license. Indeed, in Nair's deposition testimony, he admitted to knowing what the term "prescribe" meant: "Prescription and prescribe meaning if you go to a doctor, a doctor writes a prescription." His deposition testimony leaves no doubt he was not claiming Dr. Burrill recommended medication. When asked whether he understood that Dr. Burrill could not prescribe medication for Suraj because she was not licensed to do so, Nair answered: "By law, yes. [¶] . . . [¶] But she did it." Thus, assuming that Dr. Burrill recommended Suraj be given anti-psychotic medication, the charge she illegally prescribed Benzodiazepine without a license is "so far from the truth as to permit an inference of actual malice by clear and convincing evidence." (*Annette F.*, *supra*, 119 Cal.App.4th at p. 1170.)

Similarly, Nair's charge that Dr. Burrill extorted money from him is far from the truth. We need not repeat the facts surrounding the fee dispute that served as the basis for Nair's extortion charge. Suffice it to say that Nair's hostility towards Dr. Burrill, his motive to harm her reputation, and the complete absence of any evidence she extorted money from him supports an inference of actual malice by clear and convincing evidence.

Finally, with regard to whether Dr. Burrill has established a probability of proving by clear and convincing evidence Nair made the claim she committed perjury with knowledge that the claim was false or with actual doubt concerning the truth of the claim, we conclude she has done so. Nair had evidence that certain testimony Dr. Burrill gave in the underlying custody matter was false. And while it seems unlikely the discrepancies Nair points out amounted to perjury, Nair might well have believed Dr. Burrill committed perjury when he made the statements accusing her of this crime. However, as mentioned, the thrust of Nair's accusation was not simply that Dr. Burrill

45

perjured herself, but rather that she did so with respect to child custody recommendations in exchange for money. Nair offers no evidence that Dr. Burrill was paid for false testimony. Here too, we conclude Nair's hostility towards Dr. Burrill, his motive to harm her reputation, and the complete absence of any evidence that she was paid for false testimony, supports an inference of actual malice by clear and convincing evidence.

As mentioned, in order to survive Nair's anti-SLAPP motion, Dr. Burrill need not show a probability of prevailing on each part of her defamation claim. (See *Oasis*, *supra*, 51 Cal.4th at p. 820.) We conclude Dr. Burrill has established a probability of prevailing on at least one part of her defamation claim. Accordingly, the defamation cause of action survives Nair's anti-SLAPP motion unless Nair can establish as a matter of law that his statements were protected by the fair reporting privilege of Civil Code section 47, subdivision (d). We turn to this analysis now.

**D.**

***Fair Reporting Privilege***

Civil Code section 47 makes privileged "a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued." (Civ. Code, § 47, subd. (d).) Nair bears the burden of proving the privilege applies. (*Carver v. Bonds*, *supra*, 135 Cal.App.4th at pp. 348-349; *Mann*, *supra*, 120 Cal.App.4th at p. 109.) He has not carried this burden.

***1.     The Radio Interview***

Nair asserts that his statements in the radio interview are privileged under Civil Code section 47, subdivision (d), as a "fair and true report" of the citizen's criminal complaint he filed in August 2010. Not so for at least two reasons. First, Nair's radio interview was not a report of "a verified charge or complaint made by any person to a

46

public official, *upon which complaint a warrant has been issued*." (Civ. Code, § 47, subd. (d), italics added.) Nair cites no evidence that a warrant was issued upon his citizen's complaint. Instead, he argues the radio interview was nonetheless a report of a "judicial" or "other public official proceeding." (Civ. Code, § 47, subd. (d)(A), (C).) However, as the Restatement Second of Torts (§ 611, com. e, p. 300) explains: "A report of a judicial proceeding implies that some official action has been taken by the officer or body whose proceedings are thus reported. The publication, therefore, of the contents of preliminary pleadings such as a complaint or petition, before any judicial action has been taken is not within the rule stated in this Section. An important reason for this position has been to prevent implementation of a scheme to file a complaint for the purpose of establishing a privilege to publicize its content and then dropping the action. (See Comment *c*).[6] It is not necessary, however, that a final disposition be made of the matter in question; it is enough that some judicial action has been taken so that, in the normal progress of the proceeding, a final decision will be rendered."

Here, there is no evidence that any action was taken with respect to Nair's citizen's complaint. Undeterred, Nair cites *Hagberg v. California Federal Bank* (2004) 32 Cal.4th 350, a case in which our Supreme Court held the *litigation privilege* of Civil Code section 47, subdivision (b), applies to communications made to law enforcement personnel reporting suspected criminal activity. (*Id*. at p. 355.) The court explained that the litigation privilege "serves the important public policy of assuring free access to the courts and other official proceedings. It is intended to '"assure utmost freedom of communication between citizens and public authorities whose responsibility is to

---

[6] Comment c to this section provides in relevant part: "A person cannot confer this privilege upon himself by making the original defamatory publication himself and then reporting to other people what he had stated. This is true whether the original publication was privileged or not." (Rest.2d Torts, § 611, com. c, p. 299.)

investigate and remedy wrongdoing.'" [Citation.] We have explained that both the effective administration of justice and the citizen's right of access to the government for redress of grievances would be threatened by permitting tort liability for communications connected with judicial or other official proceedings." (*Id*. at pp. 360-361, italics omitted.) Consistent with this purpose, the litigation privilege "'protect[s] communications to or from governmental officials which may precede the initiation of formal proceedings.' [Citation.]" (*Id*. at p. 362.)

The fair reporting privilege is not designed to assure access to the courts and free communication between citizens and law enforcement personnel. The purpose of this privilege is to ensure the public interest is served by the dissemination of information about events occurring in official proceedings and with respect to verified charges or complaints resulting in the issuance of a warrant. (Civ. Code, § 47, subd. (d); Rest.2d Torts, § 611, com. a, p. 297.) The privilege has been held to apply to fair reports of police investigations. (*Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1337; *Howard v. Oakland Tribune* (1988) 199 Cal.App.3d 1124, 1128.) But Nair has cited us to no case, nor have we found any on our own, holding this privilege applies to a report of the charges made in a citizen's criminal complaint, made by the citizen who filed that complaint, when there is no evidence any official action has been taken with respect to the complaint. Based on the facts of this case, and the cogent reasoning of the Restatement Second of Torts (§ 611, coms. c & e pp. 299-300), we decline to hold the privilege applies to protect Nair's defamatory statements made in the radio interview.

Second, as we have explained, Nair's anti-SLAPP motion can succeed only if his evidence defeats Dr. Burrill's submission as a matter of law. (*Grewal v. Jammu*, *supra*, 191 Cal.App.4th at p. 989.) Even if the mere filing of a citizen's complaint amounted to an official proceeding within the meaning of the fair reporting privilege, we cannot conclude as a matter of law the statements made in Nair's radio interview are a "fair and

48

true report" of the charges made in that complaint. (Civ. Code, § 47, subd. (d).) "The privilege applies if the substance of the publication or broadcast captures the gist or sting of the statements made in the official proceeding." (*Balzaga v. Fox News Network, LLC*, *supra*, 173 Cal.App.4th at p. 1337.) "[W]hether or not a privileged occasion exists is for the court to decide, while the effect produced by the particular words used in an article [or broadcast] and the fairness of the report is a question of fact for the jury [citation]." (*Handelsman v. San Francisco Chronicle* (1970) 11 Cal.App.3d 381, 386, italics omitted.) "[T]he publication is to be measured by the natural and probable effect it would have on the mind of the average reader [citations]. The standard of interpretation to be used in testing alleged defamatory language is how those in the community where the matter was published would reasonably understand it [citation]. In determining whether the report was fair and true, the article [or broadcast] must be regarded from the standpoint of persons whose function is to give the public a fair report of what has taken place. The report is not to be judged by the standard of accuracy that would be adopted if it were the report of a professional law reporter or a trained lawyer [citation]." (*Id*. at p. 387.)

Here, as we have explained, there is a substantial difference between recommending that a licensed physician prescribe a certain medication and illegally prescribing that medication without a license. Nair's citizen's complaint charged the former, while the statements made in the radio interview charged the latter. At the very least, the difference between these accusations presents a question of fact with respect to whether the average listener would understand the broadcast to capture the gist or sting of the citizen's complaint, or whether the charge made in the broadcast would affect the listener differently than that made in the citizen's complaint.

## 2.    *The Online Postings*

Nor can we conclude, as a matter of law, that the online postings are privileged as a "fair and true report" on the progress of the Department of Consumer Affairs investigation into Dr. Burrill.  First, these postings do not meet "the requirement that in order to qualify as privileged such an article must state the source of its information." (*Hayward v. Watsonville Register-Pajaronian & Sun* (1968) 265 Cal.App.2d 255, 259.) Second, as with the statements made in the radio interview, it is for a jury to decide whether the online postings are a "fair and true report" of the DCA investigation.

### DISPOSITION

The trial court's order denying the anti-SLAPP motion (Code Civ. Proc., § 425.16) is affirmed.  Costs on appeal are awarded to Janelle Burrill.  (Cal. Rules of Court, rule 8.278(a).)


                                        HOCH            , J.



We concur:



     NICHOLSON          , Acting P. J.



       MURRAY          , J.


50

Filed 6/20/13

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

| | |
|---|---|
| JANELLE BURRILL, | |
| Plaintiff and Respondent, | C068998 |
| v. | (Super. Ct. No. SCV28179) |
| JAYRAJ NAIR, | ORDER FOR PUBLICATION |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Placer County, Colleen M. Nichols, J.  Affirmed.

Law Office of Stephanie J. Finelli and Stephanie J. Finelli for Defendant and Appellant.

Freidberg & Parker, Edward Freidberg, Port J. Parker and Suzanne M. Alves for Plaintiff and Respondent.


The opinion in the above entitled matter filed on June 3, 2013, was not certified for publication in the Official Reports.  For good cause it now appears the opinion should be published in the Official Reports and it is so ordered.


FOR THE COURT:


<u>      NICHOLSON      </u>, Acting P.J.


<u>       MURRAY       </u>, J.


<u>        HOCH        </u>, J.

51