Filed 6/6/14  Lee v. Li CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| LAN LEE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>YUNCHUN LI,<br><br>　　Defendant and Appellant. | H037209<br>(Santa Clara County<br>Super. Ct. No. 1-10-CV171476) |

Defendant and appellant Yunchun Li told the Federal Bureau of Investigation (FBI) and the chief executive officer (CEO) of NetLogic Microsystems (NetLogic) that a NetLogic employee, plaintiff and respondent Lan Lee, was transferring NetLogic's company protected data to China.[1]  Afterwards, Lan became the subject of a federal investigation for economic espionage and theft of trade secrets.  During the resulting federal criminal trial, Yunchun testified that she had no basis for her assertion that Lan had stolen trade secrets.  Lan was acquitted of all but one of the charges levied against him, and the prosecution later dismissed the remaining charge with prejudice.  Because of the criminal investigation and trial, Lan lost his job and spent much of his savings on his legal defense.

Subsequently, Lan filed a civil lawsuit against Yunchun for defamation, libel per se, interference with prospective economic advantage, intentional infliction of emotional

---

[1] Due to the similarity of the parties' surnames, we will refer to them by their first names for clarity.  No disrespect is intended.

distress, and invasion of privacy. Yunchun filed a special motion to strike Lan's first four causes of action (defamation, libel per se, interference with prospective economic advantage, intentional infliction of emotional distress) pursuant to the provisions of California's anti-SLAPP[2] statute (Code Civ. Proc., § 425.16).[3] The trial court denied the motion and Yunchun appealed. We conclude that the illegality of Yunchun's actions was not conclusively established by uncontroverted evidence, but Lan demonstrated he had a possibility of prevailing on his defamation claims. However, Lan has not demonstrated a probability of prevailing on his other claims. We therefore reverse the trial court's order in part.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts and allegations of the appeal are taken from the pleadings, declarations, and exhibits submitted to the trial court in support of and in opposition to the anti-SLAPP motion.

*The Federal Criminal Trial*

Lan is an electrical engineer who worked in microchip design since 1988. Lan met Yuefei Ge, Yunchun's husband, in 1997 when both were employed at Sun Microsystems. In 2001, Lan began working at NetLogic as an engineer. Sometime after, Ge also started working at NetLogic as an engineer. In 2002, Ge recruited Lan to work on a startup company making microchips to be used in network routers. Ge, Ge's friend XiaoDong Yang, and Lan incorporated a company named Sico Microsystems, Inc. (Sico) in Delaware.

---

[2] "SLAPP" stands for " 'strategic lawsuits against public participation.' " (*Navellier v. Sletten* (2002) 29 Cal.4th 82, 85 (*Navellier*).)

[3] Further unspecified statutory references are to the Code of Civil Procedure. Lan's fifth cause of action for invasion of privacy was not part of Yunchun's anti-SLAPP motion.

In an effort to jumpstart the company, Lan obtained a "spice model" from Taiwan Semiconductor Manufacturing Company (TSMC). Lan describes a spice model as a "text file that describes parameters used in electronic design for manufacturing a microchip." Meanwhile, Ge obtained a "data sheet" from NetLogic, which Lan describes as "descriptions of functions and features of a microchip" that are "used for sales and marketing purposes, and provide instructions for users, and are therefore generally not treated as confidential."

Throughout 2002 and 2003, Lan attempted to obtain financing for Sico, including through the Chinese "863" program. The superseding indictment charging plaintiff and Ge with federal crimes described the 863 program as a funding plan created by the People's Republic of China to encourage creation of technology with an emphasis on military applications.

Yunchun testified during the federal trial that she felt stressed because of her husband's efforts on Sico. Earlier, Ge had told Yunchun that he might need to quit his job at NetLogic if working on Sico became too time consuming. Ge had also used some of his own money to purchase a plane ticket to China and a calling card for Lan. Yunchun testified that she felt that her husband may have been "brainwashed" by Lan, and she felt that her husband was not taking their family's financial situation into account by continuing to work on Sico.

In September 2002, Yunchun created an e-mail account under a pseudonym and sent a message to Ron Jankov, CEO of NetLogic. The e-mail stated: "One of your employees is actively looking for ways to start his own company in the same field. He might recruit people from your company too. Name is Lan Lee. Be careful." Jankov responded and asked for additional details. Yunchun told Jankov that "[Lan] was in China talking to VCs [venture capitalists] this past weekend." At trial, Yunchun asserted that she wrote the e-mail in the hopes that someone would stop her husband from

3

continuing to work on Sico. She further stated that the information in the e-mail was the "angle" she had come up with to get Jankov's attention, because she did not think he would be concerned about her family issues. Yunchun testified that she omitted her husband's name from the e-mail since she did not want him to get in trouble.

In January 2013, an anonymous woman, later identified as Yunchun, called an FBI tip line and reported that someone named "Lan Liole" who worked at NetLogic was "exchanging some type of company protected technological information" with an individual in China. At trial, Yunchun explained that she called the FBI because she believed if she informed the federal authorities they might stop Sico from progressing. She also testified that at the time she called the FBI, she did not have any information that would indicate Ge or Lan intended to transfer technology to China. Yunchun made a second call to the FBI the next day, reiterating that she believed plaintiff was conducting some type of intellectual property or technology transfer with China. The FBI began investigating the tip.

Yunchun e-mailed Jankov a third time in March 2003. The e-mail stated: "They are running out of hope. It's not likely for him [Lan] to get funding." Later, she noticed an e-mail on Ge's computer in May that led her to believe that Sico may get funding after all. Yunchun forwarded the Sico-related e-mail to Jankov, and wrote, "Looks like Lan found one company in Beijing to pay Sico (Lan's company) to co-develop[] a network processor in China. I just don't want to see Net[L]ogic's IP [to] become Sico's IP one day. The Beijing company gave them a contract to sign. They are negotiating the terms." Yunchun testified that at the time she wrote the e-mail, she had no reason to believe that Lan or her husband intended to use NetLogic's intellectual property to design their microchips. She further testified that she had never heard them discuss plans to use NetLogic's intellectual property to start their company.

4

The FBI met with some executives at NetLogic and learned of the e-mails that had been sent by Yunchun. In July 2003, FBI agents went to Lan's home and questioned him about his work at NetLogic and about Sico. Lan agreed to let the FBI agents inspect his computer, and the agents found the spice model he had taken earlier. The FBI agents told Lan that the spice model was evidence of a crime. Lan was fired from his position at NetLogic the next day and was unable to find employment until he was hired by Intel Corporation in March 2004.

On September 26, 2007, the United States Attorney's Office filed a superseding indictment against Ge and Lan, charging both with a count of conspiracy, two counts of economic espionage, and two counts of theft of trade secrets. The trial began in October 2009 and lasted until November 2009. The jury returned a "not guilty" verdict with respect to two of the counts (a count of economic espionage and a count of theft of trade secrets with respect to TSMC). The trial court entered a judgment of acquittal on those two counts. It also entered a judgment of acquittal on the count of conspiracy and the second count of economic espionage after considering Lan's motion for acquittal. The trial court ordered a new trial as to the second count of theft of trade secrets as to NetLogic. The government dismissed this remaining charge in October 2010.

*The Civil Lawsuit*

In October 2010, Lan filed a civil lawsuit against Yunchun in state court alleging causes of action for defamation, libel per se, intentional interference with prospective economic advantage, intentional infliction of emotional distress, and invasion of privacy.[4] Lan's complaint alleged that Yunchun had sent false accusations that he was recruiting NetLogic employees to work on Sico to the CEO of NetLogic. Lan further alleged that

---

[4] Lan also alleged causes of action against his former employer, Intel Corporation. These additional causes of action against Intel are not a part of this appeal.

5

Yunchun had contacted the FBI anonymously and had falsely reported that he was transferring intellectual property and technology to China.

*The Anti-SLAPP Motion*

Yunchun filed a special motion to strike four of Lan's causes of action (defamation, libel per se, interference with prospective economic advantage, and intentional infliction of emotional distress) under section 425.16.[5] She argued that these causes of action primarily arose out of her exercise of protected petitioning activity, as her communications with the FBI were absolutely privileged under Civil Code section 47, subdivision (b).

Lan filed an opposition to the motion to strike, arguing that the statements Yunchun made to the FBI were not protected by the anti-SLAPP statute because they were illegal under title 18 United States Code section 1001(a)(3), which makes it a crime to knowingly and willfully "makes any materially false, fictitious, or fraudulent statement or representation" in "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." (18 U.S.C. § 1001(a).) Lan also argued that he could easily make a prima facie showing of malicious prosecution which is exempt from the Civil Code section 47, subdivision (b) privilege.

The trial court denied the special motion to strike on June 7, 2011. In its order, the trial court held that the causes of action in Lan's complaint arose from protected activity, Yunchun's reporting of possible criminal activity to law enforcement. (*Siam v. Kizilbash* (2005) 130 Cal.App.4th 1563 (*Siam*).) However, the court concluded that because section 425.16 expressly does not apply to illegal activity, the anti-SLAPP motion should be denied. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 316 (*Flatley*).) The court asserted that the evidence conclusively established that Yunchun had violated title

_____

[5] Lan also alleged a cause of action of invasion of privacy against Yunchun. This cause of action was not part of Yunchun's special motion to strike.

6

18 United States Code section 1001 by falsely reporting to the FBI that Lan had transferred intellectual property/technology to China. The court reasoned that "[Yunchun] cannot benefit from otherwise illegal activity because one aspect of her statement is not demonstrably false." Yunchun appealed.

## DISCUSSION

1. *Motion to Strike Portions of Defendant's Opening Brief*

First, we address Lan's motion to strike portions of Yunchun's opening brief. Lan argues that Yunchun has improperly cited to matters outside the appellate record. We do not consider documents or matters that were either not presented before the trial court or are not a part of the record on appeal. Parties should refrain from referring to matters outside the record in their briefs. (*Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632.) If a brief fails to comply with these requirements, we may either strike the brief or disregard the noncompliance. (Cal. Rules of Court, rule 8.204(e).)

Yunchun's opening brief contains citations and factual assertions not found in the record on appeal, as she cites to portions of the testimony from Lan's federal criminal trial that were not before the trial court. After filing her opening brief, Yunchun requested that we take judicial notice of the documents cited in her brief on April 12, 2012. We denied Yunchun's request for judicial notice on May 3, 2012. Accordingly, we will disregard the portions of her opening brief that cite to matters outside the record and will deny Lan's motion to strike.

2. *The Denial of the Anti-SLAPP Motion*

A. **Overview of the Anti-SLAPP Law**

The anti-SLAPP statute provides a "procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights." (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1055-1056.) Consequently, "the anti-SLAPP statute is to be construed broadly." (*Padres L.P. v. Henderson* (2003) 114 Cal.App.4th 495, 508.) In evaluating an

7

anti-SLAPP motion, the trial court must engage in a two-step process.  (*Equilon Enterprises v. Consumer Cause, Inc.* (2002) 29 Cal.4th 53, 67 (*Equilon*).)  It first determines "whether the defendant has made a threshold showing that the challenged cause of action is one arising from protected activity."  (*Navellier*, *supra*, 29 Cal.4th at p. 88.)  A defendant meets this burden by demonstrating that the plaintiff's action is premised on statements or conduct taken " 'in furtherance of the [defendant]'s right of petition or free speech under the United States [Constitution] or [the] California Constitution in connection with a public issue,' as defined in the [anti-SLAPP] statute.  (§ 425.16, subd. (b)(1).)"  (*Equilon*, *supra*, at p. 67.)  If the defendant makes the requisite showing, the burden shifts to the plaintiff to demonstrate a probability of prevailing on the claim.  (*Ibid*.)  "Only a cause of action that satisfies *both* prongs of the anti-SLAPP statute--i.e., that arises from protected speech or petitioning *and* lacks even minimal merit--is a SLAPP, subject to being stricken under the statute."  (*Navellier*, *supra*, at p. 89.)

B.  **Standard of Review**

We review the trial court's decision de novo.  (*Flatley*, *supra*, 39 Cal.4th at p. 325.)  In so doing, we consider "the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based."  (§ 425.16, subd. (b)(2).)  We do not make credibility determinations or compare the weight of the evidence presented below.  Instead, we accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law.  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 269, fn. 3.)  The court "should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim."  (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821.)

8

C. **First Prong of the Anti-SLAPP Analysis: Protected Activity**

Yunchun insists that the gravamen of Lan's causes of action against her (defamation, libel per se, intentional infliction of emotional distress, and interference with economic prospects) arise out of her exercise of protected petitioning activity. In order to address these claims, we must analyze the two categories of statements made by Yunchun that are the basis of Lan's causes of action: (1) the statements to the FBI left on the anonymous tip line and (2) the e-mails sent to Jankov, the CEO of NetLogic.

1. *Statements to the FBI*

Here the parties do not dispute that reporting of criminal activity to law enforcement constitutes protected activity under the anti-SLAPP statute, and we agree with their conclusion.[6] (*Siam*, *supra*, 130 Cal.App.4th at pp. 1569-1570.) However, Lan argues that Yunchun's reporting of criminal activity to the FBI is not protected under the anti-SLAPP statute because her statements were illegal as a matter of law. Since "the

---

[6] Yunchun also argues on appeal that the statements she made to the FBI are absolutely privileged under Civil Code section 47, subdivision (b) and therefore constitute protected petitioning activity under the anti-SLAPP statute. Yunchun has conflated two different legal concepts: the litigation privilege under Civil Code section 47 and the anti-SLAPP statute under section 425.16. "[T]he anti-SLAPP statute is not implicated, and cannot be invoked by a defendant, unless the defendant's conduct underpinning a plaintiff's cause of action involved an act in furtherance of the defendant's 'right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' [Citations.] . . . . Neither the federal nor the state *constitutional* right of petition or free speech encompass a right to file a false criminal report. Indeed, if the right of petition or free speech encompassed a right to file a false criminal report, then laws criminalizing such reports would be inherently unconstitutional. The determination whether a *privilege established by statute* immunizes [defendant] from civil liability for making a false criminal report is a wholly separate issue from the determination whether [a defendant's] conduct in the first instance was an *act in furtherance of* [his or her] *constitutional rights*." (*Lefebvre v. Lefebvre* (2011) 199 Cal.App.4th 696, 703 (*Lefebvre*).) In short, Yunchun's statements to the FBI may be privileged under Civil Code section 47, subdivision (b), but this does not necessarily mean that it is protected activity under the anti-SLAPP statute.

purpose of section 425.16 is to prevent the chilling of 'the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances' by the 'abuse of the judicial process,' " (*Flatley*, *supra*, 39 Cal.4th at p. 313) if the assertedly protected activity is illegal it cannot be "protected by constitutional guarantees of free speech and petition." (*Id*. at p. 317.)

The illegality exception to section 425.16 articulated by *Flatley* is narrow. The party opposing the anti-SLAPP motion must either show that the other party concedes to the illegal activity, or that the alleged illegality is *conclusively* established by *uncontroverted* evidence. (*Flatley*, *supra*, 39 Cal.4th at p. 320.) In *Flatley*, our Supreme Court determined that section 425.16 did not apply to the defendant's speech, which it determined to be extortion as a matter of law. (*Flatley*, *supra*, at p. 333.) There the defendant did not dispute that he sent the letters that the court later determined was extortion as a matter of law, nor did he contest the contents. (*Id*. at pp. 328-329.) The defendant also did not contest the version of the telephone calls he allegedly made as set forth in the plaintiff's opposition to the motion to strike. (*Ibid*.) As a result, the court determined that the evidence was uncontroverted. (*Ibid*.) The same result was achieved by the Second District in *Lefebvre*, *supra*, 199 Cal.App.4th at pages 705 through 706. The appellate court in *Lefebvre* determined that since the defendant did not contest the illegality and falsity of a criminal report she filed, it was conceded that her actions were not "protected petitioning activity" under section 425.16. (*Flatley*, *supra*, at p. 325.)

However, in a case where a factual dispute concerning the illegality of the statements are at issue, the *Flatley* exception is inapplicable. (*Seltzer v. Barnes* (2010) 182 Cal.App.4th 953, 965-967 (*Seltzer*).) For example, in *Seltzer*, the plaintiff failed to conclusively establish the illegality of settlement negotiations at issue as there were several factual disputes, including the defendant's intent, during the proceedings. (*Id*. at p. 965.) "[C]onduct that would otherwise be protected by the anti-SLAPP statute does

10

not lose its coverage simply because it is *alleged* to have been unlawful." (*Hansen v. Department of Corrections & Rehabilitation* (2008) 171 Cal.App.4th 1537, 1545.) The party opposing the special motion to strike bears the burden that no factual dispute exists as to the illegality of the conduct underlying the complaint. (*Seltzer*, *supra*, at p. 965.)

Lan claims that it is conclusively established from uncontroverted evidence that Yunchun's statements to the FBI were illegal as a matter of law. It is undisputed that Yunchun made two calls to the FBI through the anonymous tip line. The notes from her first call indicated that she stated that someone named "Lan Liole" who worked at NetLogic Microsystems was "exchanging some type of company protected technological information" with an individual in Shanghai, and that she believed the activity was illegal. In the second call, Yunchun stated that Lan had traveled to China twice in the past year, had a contact in China, and was engaging in "intellectual property/technology transfer" with China.

In order to determine if the illegality of Yunchun's statements are conclusively established with uncontroverted evidence, we must preliminarily determine what constitutes a violation of title 18 United States Code section 1001. The federal appellate and district courts have described a violation of title 18 United States Code section 1001 in various ways. Lan, in his opposition to the anti-SLAPP motion before the trial court, stated that the elements of a violation of title 18 United States Code section 1001 are that "the defendant made a statement; the statement was false, fictitious, or fraudulent as the defendant knew; the statement was made knowingly and willfully; the statement was within the jurisdiction of the federal agency; and the statement was material," citing to *U.S. v. Harrod* (10th Cir. 1992) 981 F.2d 1171, 1175.

It is unclear from the language of cases such as *Harrod* whether falsity is a required element of the offense. However, other courts have specifically clarified that falsity *is* an element. The Third Circuit, for example, has stated that "[s]ection 1001

11

proscribes two different types of conduct: concealment of material facts and false representations. The latter requires proof of actual falsity, whereas concealment must be established through evidence of willful nondisclosure by means of a 'trick, scheme, or device.' " (*U.S. v. Curran* (3rd Cir. 1994) 20 F.3d 560, 566.) The Ninth Circuit also appears to ascribe falsity as a required element of the offense. In *U.S. v. Jiang*, the Ninth Circuit explained that the elements of a violation of title 18 United States Code section 1001 are that the defendant (1) made a statement, (2) the statement was false, (3) the statement was made with the specific intent, (4) the statement was material, and (5) the statement was within the agency's jurisdiction. (*U.S. v. Jiang* (9th Cir. 2007) 476 F.3d 1026, 1029.)

While we acknowledge there is some ambiguity stemming from the various definitions of a violation of title 18 United States Code section 1001, it seems that falsity is likely a required element of the offense. Therefore, in order for Yunchun's statements to be illegal as a matter of law, Lan must conclusively show with uncontroverted evidence that the statements Yunchun made to the FBI were false. We conclude that Lan has not met this burden.

In support of his argument that Yunchun's statements were illegal, Lan attached excerpts of Yunchun's testimony during the federal criminal trial. The excerpted transcripts of Yunchun's testimony show that she testified that she was the one who made the two phone calls to the FBI. She further testified that at the time she made the calls, she did not possess any information indicating that Lan intended to transfer technology to China. Yunchun had also earlier testified that she initiated the contact with the CEO of NetLogic in order to stop her husband from working on the startup, as she believed the work was taking his attention away from the family.[7] Lan also attached excerpts of

---

[7] Yunchun's former testimony, attached as exhibits to plaintiff's opposition to the anti-SLAPP motion, is hearsay evidence that may be admitted against her during a trial (continued)

12

testimony from other witnesses at his federal criminal trial. These witnesses testified that the "spice model" found on Lan's computer was not protected company information and did not bear the marks of protected data and also testified that these documents were not necessarily protected intellectual property.

Yunchun, however, does not concede the illegality of the statements; she asserts that the statements were either true or expressions of her opinion.[8] She points to the e-mail she sent to Jankov that forwarded a conversation between Lan and a contact in China as evidence that Lan was engaging in some "intellectual property/technology" transfer with China. She also asserts that her statements were merely opinions that were later corroborated by the FBI's investigation and the United States Attorney's Office filing of criminal charges against Lan.

Yunchun also attached to her anti-SLAPP motion the order made by the federal trial court granting Lan's motion for acquittal in part. In this order, the judge stated that the government had presented evidence that Lan and Yunchun's husband were design engineers at NetLogic. The government had also presented evidence that they both

(Evid. Code, § 1220) and is therefore properly considered in an anti-SLAPP motion. (*Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 26.)

[8] Lan insists that Yunchun is judicially estopped from claiming that her statements to the FBI were actually true, given her testimony at the federal criminal trial. The doctrine of judicial estoppel "precludes a party from taking inconsistent positions in separate proceedings where the position in the first proceeding was adopted by the court or accepted by it as true." (*The Swahn Group, Inc. v. Segal* (2010) 183 Cal.App.4th 831, 835.) By its very nature, judicial estoppel is not applicable to bar defendant from asserting that her statements are true, as it applies to a *party* who has taken two inconsistent positions. Yunchun was not a party to the underlying federal criminal trial and the doctrine of judicial estoppel is therefore inapplicable. Lan also argues in his brief that defendant has forfeited this argument on appeal because she fails to address and analyze whether her statements to the FBI violated title 18 United States Code section 1001. Nonetheless, Yunchun does argue in her opening brief that her statements to the FBI were true, which refutes Lan's claim that she knowingly made false statements.

13

possessed technical documents taken from NetLogic's premises and there was evidence that NetLogic treated this information as a trade secret. With respect to whether the government had presented sufficient evidence of economic espionage, the court concluded that the government had presented evidence that Lan and Yunchun's husband intended to use the information obtained from NetLogic in a private company in China. There was also some evidence in the record indicating that Lan was contemplating transferring intellectual property rights to a partner in China. Yunchun also attached portions of testimony from the federal criminal trial, including testimony by the investigating FBI agent who stated that Yunchun's husband had told the authorities that Lan had traveled to China to market the business plan. The FBI agent also testified that Lan and Yunchun's husband drafted a revised Sico business plan using portions of the NetLogic data sheet.

Certainly, Lan provided compelling evidence of the illegality of Yunchun's statements to the FBI. After all, Yunchun testified at Lan's federal trial that she had no basis for the allegations she made to the FBI. However, this testimony is not conclusive, uncontroverted evidence that her statements were false and therefore illegal. Because the illegality of Yunchun's statements to the FBI is not conclusively shown and is factually disputed, her statements are protected petitioning activity under the anti-SLAPP statute.[9] (See *Siam*, *supra*, 130 Cal.App.4th at pp. 1569-1570.)

_____

[9] Furthermore, contrary to Lan's claims, we do not simply take the evidence of Yunchun's trial testimony as "true" and ignore her contrary evidence. In the second prong of the anti-SLAPP analysis, we accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law. (*Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at p. 269, fn. 3.) Our determination of whether the speech in question is illegal as a matter of law is a preliminary step in our anti-SLAPP analysis. In this step, we must determine if the statements in question are conclusively established by *uncontroverted evidence* to be illegal, as articulated in *Flatley*. (*Flatley*, *supra*, 39 Cal.4th at p. 320.) (continued)

14

## 2.  *Statements to the NetLogic CEO*

Next, Yunchun claims that her statements to the CEO of NetLogic are protected petitioning activity, because statements concerning the possibility of economic espionage that could benefit China are "conduct in furtherance of the exercise of the constitutional right of . . . free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4).)

What constitutes an issue of "public interest" within the context of the anti-SLAPP statute has been broadly construed.  A matter of "public interest" can include "not only governmental matters, but also private conduct that impacts a broad segment of society and/or that affects a community in a manner similar to that of a governmental entity. [Citations.]  ' "[M]atters of public interest . . . include activities that involve private persons and entities, especially when a large, powerful organization may impact the lives of many individuals." ' "  (*Damon v. Ocean Hills Journalism Club* (2000) 85 Cal.App.4th 468, 479.)  However, if the matter is "not of interest to the public at large, but rather to a limited, but definable portion of the public (a private group, organization, or community), the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion, such that it warrants protection by a statute that embodies the public policy of encouraging *participation* in matters of public significance."  (*Du Charme v. International Brotherhood of Electrical Workers* (2003) 110 Cal.App.4th 107, 119.)

Yunchun asserts that *Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515 (*IHHI*) is instructive.  The defendant in *IHHI* sent an e-mail to

Additionally, the jury's decision to acquit Lan of some of the charges in his federal criminal trial does not necessarily mean that it found that Lan did not commit the acts alleged, or that Yunchun's allegations were indeed false.  It only means that the jury found sufficient doubt as to one, or more, of the required elements of the offenses Lan was charged with.

members of a medical executive committee at a hospital expressing concern that the company that was seeking to purchase the hospital (IHHI) was heading for bankruptcy. (*Id*. at p. 520.) IHHI filed a lawsuit against the defendant, asserting various causes of action including defamation. (*Id*. at p. 521.) The defendant filed a special motion to strike under section 425.16, asserting that IHHI's causes of action were based on his protected speech and petitioning activity. (*IHHI*, *supra*, at p. 521.) The trial court denied the anti-SLAPP motion and the appellate court reversed the denial. (*Id*. at p. 534.) The appellate court reasoned that the defendant's e-mail was a public issue and a matter of public interest since "IHHI's acquisition and operation of four Orange County hospitals was the subject of public hearings held by both the California Senate and the Orange County Board of Supervisors, and discussed in numerous articles in newspapers and other periodicals." (*Id*. at p. 523.)

Yunchun maintains that her statements to Jankov were in the public interest, because we must view her statements against the backdrop of the government's sustained efforts to protect the competitive standing of American companies. We disagree. Courts have not precisely defined the boundaries of what constitutes an issue of public interest in the context of an anti-SLAPP motion. However, most courts have limited the interpretation of a statement of public issue to those statements concerning a person or entity that is within the public eye (*Sipple v. Foundation for Nat. Progress* (1999) 71 Cal.App.4th 226, 239 [statements involving a "nationally known figure"]), statements or conduct that could impact numerous individuals beyond the parties (*Damon v. Ocean Hills Journalism Club*, *supra*, 85 Cal.App.4th at p. 479 [statements would affect more than 3,000 members]), or statements that would otherwise have a widespread interest in the public (*M.G. v. Time Warner, Inc.* (2001) 89 Cal.App.4th 623, 629 [statements arising from Sports Illustrated cover story about child molestation in youth sports]).

16

This issue was contemplated by our colleagues at the First District in *Rivero v.*
*American Federation of State*, *County and Municipal Employees*, *AFL-CIO* (2003) 105
Cal.App.4th 913 (*Rivero*). In *Rivero*, a worker filed a lawsuit against various entities,
including a union, alleging various causes of action including libel and slander. The
worker alleged that the union distributed documents containing false information that
alleged he solicited bribes, hired family members, practiced favoritism, harassed
employees, and was abusive. (*Id.* at pp. 916-917.) The union filed an anti-SLAPP
motion, in part arguing that statements criticizing an unlawful workplace activity concern
a public issue. (*Id.* at p. 925.) The appellate court disagreed, noting that the union's
statements concerned *one* worker who had not been subject to public attention or media
coverage and that the individuals involved in and affected by the statements were limited
in number. (*Id.* at p. 924.) The *Rivero* court further acknowledged that if it adopted the
union's argument, "nearly every workplace dispute would qualify as a matter of public
interest," and that a better-reasoned policy to adopt was to find that "unlawful workplace
activity below some threshold level of significance is not an issue of public interest, even
though it implicates a public policy." (*Ibid.*)

The appellate court also rejected the union's other attempts to characterize the
statements as concerning public issues. It concluded that even though the worker was
employed at a publicly financed institution, not every allegedly inappropriate use of
public funds constitutes a matter of public interest. (*Rivero*, *supra*, 105 Cal.App.4th at p.
925.) It further rejected the union's argument that the statements somehow related to the
greater union membership's "generalized concern regarding disrespectful supervision and
of the broader issue of abusive supervision throughout the University of California
system." (*Ibid.*)

Like the union in *Rivero*, Yunchun argues that her statements are protected under
the anti-SLAPP statute because they must be viewed as comments on the broader

17

problem of safekeeping the competitiveness of domestic businesses and protecting trade secrets, which are public issues. Yunchun's argument on this ground fails for the same reasons articulated in *Rivero*. Widespread theft of trade secrets and maintaining the competitive edge of American companies in the global market may be an issue of public concern. However, Yunchun's statements to Jankov were not about this broader issue. Her statements concerned the theft of one company's intellectual property by one employee. Yunchun does not otherwise demonstrate that Lan's alleged actions would have a wider impact, or that it would involve more members of the public. Furthermore, the alleged intellectual property theft was not an issue that received widespread publicity, nor did it reach the type of "threshold level of significance" as articulated in *Rivero* that would elevate it to a matter of public concern. (*Rivero*, *supra*, 105 Cal.App.4th at p. 924.)

*IHHI*, which Yunchun relies on, also does not support her position. The plaintiff's comments in *IHHI* were determined to be concerning a matter of public interest because the hospital's acquisition had been the subject of public hearings and press coverage. (*IHHI*, *supra*, 140 Cal.App.4th at p. 523.) Contrary to Yunchun's claims, no such public interest exists here. Therefore, Yunchun's statements to Jankov are not protected under the anti-SLAPP statute, as she has not shown that they are in connection with an issue of public interest. (§ 425.16, subd. (e)(3).)

### D. Second Prong of the Anti-SLAPP Analysis: Probability of Prevailing on the Merits

Yunchun has met her burden to show that Lan's causes of action arise from some protected activity (her statements to the FBI). She has not met her burden to show that her statements to Jankov are protected. However, Lan's causes of action could still be subject to a motion to strike because they would constitute mixed causes of actions. A mixed cause of action is "subject to section 425.16 if at least one of the underlying acts is

18

protected conduct, unless the allegations of protected conduct are merely incidental to the unprotected activity." (*Salma v. Capon* (2008) 161 Cal.App.4th 1275, 1287, citing to *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton LLP* (2005) 133 Cal.App.4th 658, 672.) Therefore, in order to survive Yunchun's anti-SLAPP motion, the burden is on Lan to demonstrate he has a probability of prevailing on his claims.

In order to establish a probability of success, a plaintiff must demonstrate he or she has a legally sufficient claim. (*Taus v. Loftus* (2007) 40 Cal.4th 683, 713-714.) " 'Put another way, the plaintiff "must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited." ' " (*Ibid.*) In doing so, we do not weigh the credibility of probative strength of the competing evidence. We accept the opposing party's evidence as true and evaluate the moving party's evidence only to determine if it has defeated the opposing party's evidence as a matter of law. (*Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at p. 269, fn. 3.)

Notably, Lan did not argue below that he had a probability of prevailing on any of the claims subject to Yunchun's anti-SLAPP motion. Instead, he argued that the "gravamen of his case (malicious institution of criminal proceedings) is not barred by privilege under Civil Code § 47." Lan then asserted that he had made a prima facie showing of malicious prosecution which is exempt from the litigation privilege and that should the trial court reach the second prong of the anti-SLAPP analysis he should be allowed to amend his complaint to allege a cause of action for malicious prosecution. On appeal, Lan has similarly argued that he had made a prima facie showing of malicious

19

prosecution. However, he also raises for the first time that he satisfied his burden to demonstrate he had a probability of prevailing on his defamation claims.[10]

On appeal, a judgment or order will be affirmed if it is correct on any theory, regardless of the trial court's reasons. (*Bailon v. Appellate Division* (2002) 98 Cal.App.4th 1331, 1339.) Accordingly, parties may raise a new argument on appeal in order to establish the trial court's ruling was correct, " 'unless doing so would unfairly prejudice appellant by depriving him or her of the opportunity to litigate an issue of fact.' " (*Ibid.*, italics omitted.) We review the trial court's denial of Yunchun's anti-SLAPP motion de novo, so we will address this issue even if the trial court did not. (*Roberts v. Los Angeles County Bar Assn.* (2003) 105 Cal.App.4th 604, 615-616.)

### 1. *Defamation and Libel Per Se*

"Defamation requires the intentional publication of a false statement of fact that has a natural tendency to injure the plaintiff's reputation or that causes special damage." (*Burrill v. Nair* (2013) 217 Cal.App.4th 357, 383 (*Burrill*).) "The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1369.) Libel is defamation that is written. (*Ibid.*) If a statement is defamatory on its face, it is libelous per se, and actionable without proof of special damages. (*Burrill*, *supra*, at p. 382.) "[F]alse statements charging the commission of a crime or tending directly to injure a plaintiff in respect to his or her profession by imputing dishonesty or questionable professional conduct are defamatory per se." (*Id.* at p. 383.)

---

[10] Lan's complaint alleged a cause of action for defamation and a cause of action for libel per se. His respondent's brief does not specify if he is arguing that he has a probability of prevailing on his defamation claim, his libel per se claim, or both. Given the relatedness of these claims, we address them jointly.

Lan claims that the statements Yunchun made to the FBI and to Jankov were defamatory in nature. Lan alleges that the statements Yunchun made to the FBI asserting that he was illegally exchanging company protected information with an individual named Qian Zhang in China were false. He also alleges that Yunchun's statement to Jankov that she did not want to see "NetLogic's IP become Sico's IP one day" was false and defamatory.

Yunchun contends that her statements were either the truth or her own opinion, which are not actionable defamation. However, statements of opinion do not necessarily enjoy blanket protection from defamation actions. "[W]here an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation. [Citation.] The 'crucial question of whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court. [Citation.]' [Citation.] 'Only once the court has determined that a statement is reasonably susceptible to such a defamatory interpretation does it become a question for the trier of fact whether or not it was so understood. [Citations.]' [Citation.] The question is ' "whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact . . . ." ' " (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 696.)

"In determining whether a publication has a defamatory meaning, the courts apply a totality of the circumstances test to review the meaning of the language in context and whether it is susceptible of a meaning alleged by the plaintiff." (*Balzaga v. Fox News Network, LLC* (2009) 173 Cal.App.4th 1325, 1337.) "In determining whether statements are of a defamatory nature, and therefore actionable, ' "a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of the complaint for libelous publication according to its natural and popular construction." ' " (*Morningstar, Inc. v. Superior Court* (1994) 23 Cal.App.4th 676, 688.)

At one point during her e-mail exchanges with Jankov, Yunchun wrote that she did not "want to see Net[L]ogic's IP become Sico's IP one day." This statement carries the implication that Lan was taking NetLogic's intellectual property with the intent to use it for Sico and also implies that Lan was stealing NetLogic's trade secrets, which would constitute libel per se. (*Barnes-Hind*, *Inc*. *v*. *Superior Court* (1986) 181 Cal.App.3d 377, 385 [finding that "[p]erhaps the clearest example of libel per se is an accusation of crime."].) The same is true of her statements to the FBI alleging that Lan was exchanging company protected secrets, which also implies that Lan is committing intellectual property theft. These statements imply provably false factual assertions and could therefore constitute the basis of a defamation action.

## 2. *Probability of Prevailing on the Defamation Claims*[11]

Next, we must ascertain whether Lan made a prima facie showing that he could prevail on his claims. Preliminarily, we address Yunchun's argument that the statements constituting Lan's defamation actions are privileged. The issue of privilege is " 'relevant to the second step in the anti-SLAPP analysis in that it may present a substantive defense a plaintiff must overcome to demonstrate a probability of prevailing.' " (*Feldman v*. *1100 Park Lane Associates* (2008) 160 Cal.App.4th 1467, 1485.) If both categories of statements are privileged, Lan will have no probability of prevailing on his claims.

Yunchun contends that her statements to the FBI, even if they were made falsely and maliciously, are protected under the litigation privilege codified under Civil Code section 47, subdivision (b). (*Siam*, *supra*, 130 Cal.App.4th at pp. 1569-1570; *Hagberg v*.

---

[11] Unlike our analysis in part C, whether Lan has sufficiently alleged a prima facie showing of falsity in the second prong of the anti-SLAPP analysis does not require that he demonstrate falsity with uncontroverted, conclusive evidence. As previously noted, we do not weigh credibility of witnesses or resolve factual issues when determining if Lan has demonstrated a probability of prevailing. (*Balzaga v*. *Fox News Network*, *LLC*, *supra*, 173 Cal.App.4th at p. 1336.)

22

*California Federal Bank* (2004) 32 Cal.4th 350.) We agree that her report of a crime to the FBI is absolutely privileged under Civil Code section 47, subdivision (b).

Second, Yunchun argues that her statements to Jankov are also privileged under the qualified common interest privilege codified at Civil Code section 47, subdivision (c). Civil Code section 47, subdivision (c) "extends a conditional privilege against defamation to statements made without malice on subjects of mutual interests. [Citations.] This privilege is 'recognized where the communicator and the recipient have a common interest and the communication is of a kind reasonably calculated to protect or further that interest.' [Citation.] The 'interest' must be something other than mere general or idle curiosity, such as where the parties to the communication share a contractual, business or similar relationship or the defendant is protecting his own pecuniary interest. [Citation.] Rather, it is restricted to 'proprietary or narrow private interests.' " (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 287.)

" 'One authority explains the statutory interest as follows: (1) The "interest" applies to a defendant who "is protecting his own pecuniary or proprietary interest." (2) The required "relation" between the parties to the communication is a contractual, business or similar relationship . . . . (3) The "request" referred to must have been in the course of a business or professional relationship.' " (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 914.) The defendant has the burden to show that the statement was privileged. The burden then shifts on the plaintiff to show that the defendant made the statement with malice. (*Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 108.) Whether the statements are privileged is a question of law. (*Ibid.*; *Hui v. Sturbaum* (2014) 222 Cal.App.4th 1109, 1118-1119.)

Civil Code section 48 provides "that with respect to statements falling within [Civil Code] section 47[, subdivision] (c), 'malice is not inferred from the communication.' " (*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1204.) "For purposes

23

of this statutory privilege, malice has been defined as ' "a state of mind arising from hatred or ill will, evidencing a willingness to vex, annoy or injure another person." ' " (*Ibid.*) Here Lan submitted Yunchun's testimony at his federal criminal trial where she admitted she contacted Jankov without any basis for her allegations. Yunchun also testified at the trial that she had contacted Jankov hoping that someone would stop Lan and her husband from continuing work on Sico, because she was concerned about the toll working on the startup was taking on her family. If credited, this evidence could allow a rational trier of fact to make a finding of malice, rendering the qualified common interest privilege inapplicable to the statements Yunchun made to Jankov.

Accordingly, the statements Yunchun made to the FBI are privileged under Civil Code section 47, subdivision (b), but the statements she made to Jankov are not necessarily privileged under Civil Code section 47, subdivision (c). We must therefore determine whether Lan submitted the evidence necessary to make the " ' "minimum level of legal sufficiency and triability" ' " needed to satisfy the second prong of the anti-SLAPP statute based solely on the e-mails Yunchun sent to Jankov implying that Lan was stealing intellectual property. (*Castleman v. Sagaser* (2013) 216 Cal.App.4th 481, 490.) We conclude that he has.

Lan submitted evidence that there was a publication by attaching copies of the e-mails Yunchun sent to Jankov, including the one where she wrote that she did not want to see "NetLogic's IP become Sico's IP one day." Lan also submitted evidence that the statement Yunchun made implying that he was taking NetLogic's intellectual property for use in his own startup company was false and defamatory. As previously described, Lan attached excerpts of the trial testimony to his opposition to the anti-SLAPP motion. This testimony contains evidence that Yunchun had no basis or knowledge about Lan transferring NetLogic's intellectual property. Lan's declaration, attached to his opposition to the anti-SLAPP motion, asserted that the data sheet he took from NetLogic

24

was not confidential property, and that it was made publicly available on NetLogic's Web site. Furthermore, he asserted that in his experience in the industry, data sheets were not typically treated as confidential. Lan also included excerpts of testimony from experts at trial who opined that NetLogic failed to adequately identify its data sheets as protected trade secrets. Given that the statements Yunchun made implied Lan was committing theft of intellectual property, it was defamatory per se if false. (*Burrill*, *supra*, 217 Cal.App.4th at pp. 385-386.)

Lan has therefore satisfied his burden to allege facts and demonstrate that his causes of action for defamation and libel per se are legally sufficient and supported by a prima facie showing of facts. Yunchun may have submitted evidence to the contrary, asserting that Lan may have taken information that was considered trade secret by NetLogic, but we do not weigh the credibility of evidence. In this stage of the anti-SLAPP analysis we accept Lan's evidence as true. (*Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at p. 269, fn. 3.) Lan has made the minimal showing necessary to defeat Yunchun's motion to strike on these claims.

Notably, defamation was just one of several causes of action in Lan's complaint against Yunchun. Lan also filed a cause of action for intentional interference with prospective economic advantage, and intentional infliction of emotional distress. Both of these causes of action were based on Yunchun's statements to the FBI and to Jankov. However, Lan has not argued that he has established a probability of prevailing on these causes of action. "If an appellant fails to raise a point in an appellate brief, we may treat the issue as waived; we do so here." (*Raining Data Corp. v. Barrenechea* (2009) 175 Cal.App.4th 1363, 1372.) Therefore, Lan has not demonstrated he has a probability of prevailing on his claim for interference with prospective economic advantage and intentional infliction of emotional distress. Since these claims were also based on Yunchun's statements to the FBI, which are protected under section 425.16, they are

25

subject to the motion to strike as a mixed cause of action. (*Salma v. Capon*, *supra*, 161 Cal.App.4th 1275.)

### E. Amending Complaint to Allege Cause of Action of Malicious Prosecution

Lan argues that he should be given the opportunity to amend his pleadings to state a cause of action for malicious prosecution.

Appellate courts have noted that "section 425.16 provides no mechanism for granting anti-SLAPP motions *with leave to amend*." (*Martin v. Inland Empire Utilities Agency* (2011) 198 Cal.App.4th 611, 629.) Therefore, "[t]rial courts should either grant or deny such motions in toto, i.e., without leave to amend, prior to ruling on any pending demurrers. A proper ruling on the anti-SLAPP motion would, in most cases, obviate the need to rule on the demurrer at all or, at the very least, in its entirety." (*Ibid.*)

Some appellate courts have given plaintiffs the opportunity to amend their pleadings when ruling on anti-SLAPP motions. In *Nguyen-Lam v. Cao* (2009) 171 Cal.App.4th 858 (*Nguyen-Lam*), the trial court determined that the plaintiff in the case had a probability of prevailing on her claim for defamation based on the evidence submitted by both parties. (*Id.* at p. 862.) The trial court therefore allowed the plaintiff to amend her complaint to plead actual malice, which she had failed to include in her original complaint but was present in the evidence she submitted. (*Ibid.*) The Fourth District affirmed the trial court's judgment. The court distinguished the situation presented in *Nguyen-Lam* from other cases, including *Simmons v. Allstate Ins. Co.* (2001) 92 Cal.App.4th 1068 (*Simmons*). In *Simmons*, the court concluded that "permitting an amendment to thwart the defendant's initial prima facie showing of protected activity would undermine section 425.16's 'quick dismissal remedy.' " (*Nguyen-Lam*, *supra*, at p. 870, citing *Simmons*, *supra*, at p. 1073.) The *Simmons* court opined that "[i]nstead of having to show a probability of success on the merits, the SLAPP plaintiff would be able to go back to the drawing board with a second opportunity to disguise the vexatious

26

nature of the suit through more artful pleading. . . . [¶] By the time the moving party would be able to dig out of this procedural quagmire, the SLAPP plaintiff will have succeeded in [the] goal of delay and distraction and running up the costs of his opponent." (*Simmons*, *supra*, at pp. 1073-1074.)

The *Nguyen-Lam* court distinguished *Simmons* on several grounds. First, the court noted that unlike the *Simmons* plaintiff, Nguyen-Lam's amendment would not "attempt to void defendant's showing on the first prong of the anti-SLAPP inquiry." (*Nguyen-Lam*, *supra*, 171 Cal.App.4th at p. 870.) The court further explained that the "plaintiff's amendment had nothing to do with defendant's assertion his statements were made in connection with his right of petition or free speech. Rather, assuming that showing had been made, and in conjunction with her burden on the second prong to show a probability of prevailing on the merits, plaintiff sought to amend the complaint to plead specifically that defendant harbored the requisite actual malice as shown by the evidence presented for the hearing on the strike motion." (*Id.* at pp. 870-871.)

The court determined that because Nguyen-Lam demonstrated a probability of prevailing at trial if she could amend her complaint to include malice, " '[d]isallowing an amendment would permit defendant to gain an undeserved victory, undeserved because it was not what the Legislature intended when it enacted the anti-SLAPP statute.' " (*Nguyen-Lam*, *supra*, 171 Cal.App.4th at p. 873.) The court then concluded that when "the strike opponent has demonstrated the requisite probability of success in showing such malice, as here, her complaint falls outside the purpose of the anti-SLAPP statute-- indeed, it is not a SLAPP suit at all. Simply put, the Legislature did not intend to shield statements shown to be malicious with an unwritten bar on amendment in the circumstances here. Consequently, the trial court did not err in permitting [Nguyen-Lam] to amend her complaint to plead actual malice in conformity with the proof presented at the hearing on the strike motion." (*Ibid*.)

27

The *Nguyen-Lam* plaintiff sought to amend her complaint to plead a necessary element of one of her causes of actions, not to plead a new cause of action. Such a scenario was contemplated in *Navellier v. Sletten* (2003) 106 Cal.App.4th 763 (*Navellier II*). There, the plaintiff had filed a breach of action against a defendant for fraud and breach of contract. The defendant filed a special motion to strike the complaint under section 425.16, which was denied. The First District initially affirmed on the basis that the first prong of the anti-SLAPP test was not satisfied. The Supreme Court reversed, finding that the first prong was satisfied, and ordered the First District to address the second prong. The First District concluded that the plaintiffs did not satisfy the second prong since they did not establish a probability of prevailing on their claims. (*Navellier II*, *supra*, at pp. 766-768.) The plaintiff's cause of action for fraud was barred by the litigation privilege (Civ. Code, § 47), as they arose from the defendant's counterclaims filed in federal court. (*Navellier II*, *supra*, at pp. 769-770.)

The *Navellier II* plaintiff, like Lan, argued that they should be given the opportunity to amend their complaint to add a cause of action for malicious prosecution, which would not be barred by the litigation privilege. The First District disagreed, asserting that "a plaintiff cannot use an eleventh-hour amendment to plead around a motion to strike under the anti-SLAPP statute." (*Navellier II*, *supra*, 106 Cal.App.4th at p. 772.) The court noted that nothing had prohibited the plaintiffs from timely alleging a malicious prosecution claim against the defendants, as the federal judgment had been final before the motion to strike was filed. (*Id.* at p. 773.)

Lan asserts that all of the facts necessary for a cause of action of malicious prosecution are present in his complaint and in the materials supporting his opposition to the anti-SLAPP motion. He therefore argues that he should be allowed leave to amend his complaint to allege a cause of action of malicious prosecution. However, *Nguyen-Lam* is distinguishable; the plaintiff there sought to amend her complaint to plead a

28

necessary element, malice, to one of her alleged causes of actions. Lan, like the plaintiff in *Navellier II*, seeks the opportunity to amend his complaint to plead an entirely new cause of action. Nothing prohibited Lan from pleading a cause of action for malicious prosecution at the outset of the litigation, as the federal trial against Lan concluded prior to his filing of a civil lawsuit against Yunchun. Under the reasoning set forth in *Navellier II*, we reject Lan's contention that he should be allowed leave to amend his complaint to assert a new cause of action for malicious prosecution.

## DISPOSITION

The order of the superior court denying the special motion to strike is reversed. The court is directed to enter a new order granting Yunchun Li's Code of Civil Procedure section 425.16 motion with respect to Lan Lee's causes of action for interference with prospective economic advantage and intentional infliction of emotional distress and denying the Code of Civil Procedure section 425.16 motion with respect to Lan Lee's causes of action for defamation and libel per se. The parties are to bear their own costs on appeal.

_____
                                    Premo, J.

WE CONCUR:




_____
        Rushing, P.J.




_____
        Elia, J.